Willie Lee **RICHMOND**, Petitioner,

v.

James R. **RICKETTS**, Director, Arizona Department of Corrections; and Donald Wawrzaszek, Superintendent of the Arizona State Prison, Respondents.

No. CIV 84–010 TUC ACM.

United States District Court,
D. Arizona.

July 11, 1986.

Jack Roberts, Asst. Atty. Gen., Dept. of Law, Phoenix, Ariz., for petitioner.

Carla Ryan, Pima County Public Defender's Office, Tucson, Ariz., Tim Ford, Seattle, Wash., for respondents.

## ORDER

MARQUEZ, District Judge.

Petitioner, Willie Lee Richmond [Richmond], filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his conviction for first degree murder and his sentence of death.

## FACTS AND PROCEDURAL HISTORY

During the late evening hours of August 25, 1973, Richmond and his fifteen year old girlfriend, Faith Erwin [1], went to the Bird Cage Bar in Tucson. They waited outside for a friend of theirs named Rebecca Corella [2] who was a nude dancer at that bar. Corella came out of the bar with Bernard Crummett. They sat and talked for a while in the front seat of the car that Richmond had driven to the bar. Richmond and Erwin stood nearby in the parking lot. After a short while Richmond joined Corella and Crummett in the car. An argument ensued between Richmond and Crummett because Crummett wanted Erwin to perform an act of prostitution with him. Richmond refused to allow Erwin to perform the act. Corella agreed, however, to prostitute herself with Crummett for twenty dollars. Erwin then joined the other three in the car and Richmond drove them to the hotel on Benson Highway in Tucson where Corella was staying.

Corella decided that she was interested in robbing Crummett. Before she tried to rob him, Corella decided to find out how much money Crummett had with him. She had Richmond act as her pimp with Crummett. Crummett paid Corella the twenty dollars in advance of the act. Corella then left the room to give the money to Richmond who switched the twenty dollar bill for a ten dollar bill he had. He then harassed Crummett about trying to give them less money. Crummett then opened his wallet to pay the additional ten dollars.

When Crummett opened his wallet, it was Corella's job to observe how much money was in the wallet so that she and Richmond could determine if it would be worth their while to rob Crummett. She apparently observed what she believed to be a large amount of money and notified Richmond that Crummett was "loaded." Corella and Crummett then went into one of the bedrooms of the hotel for a period of time. While they were in there, Richmond whispered to Erwin that they intended to rob Crummett but that Erwin should not say anything.

---

**1.** In various locations in the state court record and in some of the pleadings before this court she is also identified as Faith Irwin.

**2.** She is also referred to in the state record and some of the pleadings before the court as Becky Corrella.

Shortly thereafter, Corella and Crummett came out of the bedroom and all four people got back in the car. Richmond again drove the car. They headed toward the west end of 22nd street in Tucson just west of "A" Mountain. When they reached the end of the paved road, which is in a desert area, Richmond stopped the car and got out. Corella, who was in the back seat with Crummett, informed Crummett that they had a flat tire and he should get out and help. Immediately after Crummett exited the car he was struck to the ground by Richmond. He was rendered unconscious. Richmond then walked around to the desert on the passenger side of the car and picked up some large rocks. Richmond stood directly over Crummett and threw the rocks at Crummett's head.

Crummett's pockets were then turned inside out and his wallet and watch were taken. The record is not clear whether it was Corella or Richmond or both who removed the objects from Crummett. The record indicates, however, that both Corella and Richmond shared in the proceeds from the robbery and Richmond later threw the watch out of the car window.

Following the robbery, Corella, Richmond and Erwin reentered the car leaving Crummett in the street. The car ran over Crummett as he laid in the street. The medical testimony at the trial indicates that Crummett was run over twice by the car and because of the direction and nature of the injuries, the car had to run over him two separate times. There was evidence that the body had been dragged under the car for a short distance. However, the injuries were of such a nature that they could not have been caused by the front and rear tires in one pass. The medical evidence also indicated that after the first infliction of injury to Crummett, the direct impact of a car tire to his head, Crummett suffered a massive head injury that caused his death. The second infliction of injury to Crummett was the passing of a car tire over Crummett's chest. Although the injuries to the chest were substantial, there was no bleeding, internally or externally from these injuries. That indicated to the

medical examiner that the two passes of the car occurred at least thirty seconds apart and by the time the second injury occurred, Crummett's heart had already stopped beating and he had suffered a massive loss of blood. The body was discovered in the street several hours later.

Erwin testified at trial that Richmond was driving the car when it ran over Crummett. It was Richmond's contention that Corella was the one who drove the car. There was evidence at trial that both Richmond and Erwin had used heroin that night prior to going to the Bird Cage Bar and that Erwin was ill with "cotton fever." Erwin testified that she only heard the car strike Crummett one time. The proceeds from the robbery, other than the watch, was fifty dollars.

Shortly thereafter, Richmond was arrested on two other unrelated charges of first degree murder. On September 11, 1973 Richmond, while in jail, was served with the arrest warrant for the first degree murder of Bernard Crummett. He agreed to make a statement to the police officers concerning his involvement in the crime after he was given his *Miranda* warnings. In that statement, Richmond admitted to being a participant in the robbery and admitted to striking Crummett with the rocks, but he contended that Corella was driving the car. He said that Corella backed the car up and ran over Crummett. She then drove forward and ran over him again. Richmond's statement was the only evidence indicating that it was their car that struck Crummett the second time as the subsequent medical testimony revealed that the second infliction of the injuries could have occurred anytime between thirty seconds after the first one until the body was found several hours later.

Richmond was tried by a jury on charges of first degree murder and robbery. As to the murder charge, the prosecution presented evidence of both premeditated first degree murder and first degree murder under the felony murder rule. Richmond was convicted of both counts. Fol-

lowing a hearing pursuant to A.R.S. § 13–454,[3] on February 27, 1974, Richmond was sentenced to between fifteen and twenty years on the robbery charge and death as to the murder charge.

Since the sentence of death was imposed, an automatic appeal was filed directly with the Arizona Supreme Court. During the pendency of the appeal, Richmond filed a petition in the trial court for post-conviction relief pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. In support of the petition, Richmond attached affidavits by two persons who stated that they were told by Corella that Corella, not Richmond, was driving the car when it struck Crummett. The petition was denied and an appeal was taken of that decision. The two appeals were consolidated by the Arizona Supreme Court. Both the convictions and sentence of death were affirmed by that court, *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976). The United States Supreme Court denied a petition for a writ of certiorari, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1976).

During the pendency of the automatic appeal, Richmond was convicted of one of the prior charges of first degree murder. He received a sentence of life imprisonment on that charge. The homicide in that case occurred before the effective date[4] of the Arizona death sentencing statute so that penalty was not applicable. Richmond was also tried on the third charge of first degree murder and was acquitted of that charge.

Richmond then filed a petition for a writ of habeas corpus in federal court challenging both his conviction and his sentence with regard to the killing of Crummett. The District Court upheld the validity of the conviction but invalidated the sentence of death because the state statute as written placed too great a limitation of the Defendant's ability to present mitigating factors to the sentencing judge and accordingly, violated the Constitution, *Richmond*

*v. Cardwell,* 450 F.Supp. 519 (D.Ariz.1978). No appeal was taken from that decision.

Shortly after the writ of habeas corpus was granted, the Arizona Supreme Court also held that the death sentencing statute was unconstitutional for the same reasons. In the opinion, the court severed the unconstitutional portion of the statute and affirmed the remainder, *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978). Following this decision, the Arizona Supreme Court vacated each conviction and sentence of death for everyone on death row in Arizona, including Richmond, and remanded each case to the Superior Court for re-sentencing, placing no limitations upon the evidence that the Defendant could offer in mitigation. During the pendency of Richmond's resentencing, the Arizona legislature also amended the death penalty statute to add another statutory mitigating factor of the Defendant's age at the time the offense was committed.

Also while the re-sentencing was pending, Richmond joined a class action petition for a writ of habeas corpus filed by all persons on death row. That action challenged the authority of the Arizona Supreme Court to sever the invalid portion of the statute. The authority of the state supreme court to interpret its own laws was upheld, *Knapp v. Cardwell,* 513 F.Supp. 4 (D.Ariz.1980) and that decision was affirmed on appeal, *Knapp v. Cardwell,* 667 F.2d 1253 (9th Cir.1982), *cert. denied* 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982).

Richmond's hearing with regard to aggravating and mitigating factors under A.R.S. § 13–454 was held on March 11, 12 and 13, 1980. Following the evidentiary hearing, the court found three aggravating factors present and no mitigating factors sufficiently substantial to call for leniency. Richmond was again sentenced to death and again an automatic appeal was filed with the Arizona Supreme Court.

---

**3.** The statute has been amended and renumbered to A.R.S. § 13–703.

**4.** The post-*Furman* Arizona death sentencing statute became effective August 8, 1973.

During the pendency of the second appeal, Richmond filed a second petition for post-conviction relief under Rule 32 of the Arizona Rules of Criminal Procedure. In that petition, he challenged the constitutionality of the Arizona death sentencing statute as being unconstitutionally applied against Richmond in a discriminatory manner based on his race (black) and his poverty status. The petition was summarily denied and an appeal of that decision was filed with the Arizona Supreme Court. The two appeals were consolidated. The Supreme Court affirmed the sentence of death by a divided court, *State v. Richmond*, 136 Ariz. 312, 666 P.2d 57 (1983). Richmond moved for rehearing before the Arizona Supreme Court raising numerous constitutional issues, but that court refused to reconsider its decision. Richmond's petition for a writ of certiorari to the United States Supreme Court was denied, 464 U.S. 986 (1983).

A third petition for post-conviction relief under Rule 32 of the Arizona Rules of Criminal Procedure was then filed in the trial court. That petition raised many of the same grounds that were presented in the motion for rehearing before the Arizona Supreme Court. This petition was summarily denied and the Arizona Supreme Court denied review of the decision. This action was then filed.

Richmond filed this action shortly before his scheduled execution date and initially sought a stay of execution. The petition contained some claims that were not presented to the state courts in a manner that satisfied the exhaustion requirements and accordingly, this court dismissed those allegations. The court then summarily denied the remaining grounds of the petition on their merits and denied the request for a stay of execution.

Appeal of this decision was made to the Ninth Circuit Court of Appeals. Richmond's execution was stayed by that court. Shortly thereafter, the court affirmed this court's order dismissing the petition in accordance with *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), but vacated that portion of the order ruling on the merits of the exhausted claims. The court remanded the case to this court to set a reasonable period of time for Richmond to amend his petition, *Richmond v. Ricketts*, 730 F.2d 1318 (9th Cir.1984). The court also vacated its stay of execution as having been rendered moot by the expiration of the warrant of execution.

Pursuant to the mandate of the Ninth Circuit, Richmond was directed to file an amended petition with this court. The amended petition was filed on May 21, 1984. The Respondents filed their answer along with twenty-five exhibits which consist of the pertinent state court record. After a review of the record and the allegations of the petition, on November 5, 1984, this court issued an order denying the petition as being partially without merit and as to the remaining parts because the claims constituted an abuse of the writ of habeas corpus. Many of these claims were presented in the initial habeas corpus petition filed in Federal Court in 1978 and several of the others were known at that time but were not presented in the initial petition. Appeal was taken from that decision.

Although the state court record consisting of the twenty-five exhibits was designated as a part of the record on appeal to the Ninth Circuit, the clerk of this court neglected to forward those documents to the Ninth Circuit. The Ninth Circuit reversed the decision of this court, holding that this court did not state in its order that it had reviewed the record and in fact could not do so since no record had been presented to this court. The court also held that the doctrine of abuse of the writ and waiver were not applicable in this case as to the challenges to the death sentence itself. The doctrine of abuse of the writ was held validly applied as to the challenges to the underlying conviction. The case was remanded to this court to specify the review of the state court record, to indicate what portions of that record support the conclusions of this court, and to

determine if there is a need to hold an evidentiary hearing.

Subsequent to the remand of this case by the Ninth Circuit, the clerk of this court discovered its prior error in not forwarding the record to the Court of Appeals. The Court of Appeals was notified of this error and the decision was amended to delete that portion of the order indicating that this court did not have the state court record to review, *Richmond v. Ricketts,* 774 F.2d 957 (9th Cir.1985).

This court has conducted a thorough and exhaustive examination of the pleadings before it, the arguments of counsel[5], and the state court record submitted to it.[6] There appears to be no reason why this court should not determine these issues on their merits.[7] The court will set forth additional facts and the locations of those facts throughout the remainder of the opinion where appropriate and necessary for the decision of the issues.

## EXHAUSTION

Following the remand from the Ninth Circuit in this matter, the court carefully re-reviewed the petition. This court could not locate several of the issues in the petition in the state court arguments presented in such a manner as to satisfy the exhaustion requirements under 28 U.S.C. § 2254(b) and (c). The court directed each party to brief each of those issues and they have done so. After a careful review of the arguments of Richmond on this matter, it appears that Richmond has presented sufficiently similar issues to all the state courts so as to meet the exhaustion requirements as to some of the claims.

As to the remainder of the claims, this court believes that it would be futile to dismiss this action and return Richmond to the state courts to exhaust the other claims. Richmond has already filed three separate petitions for post-conviction relief alleging similar grounds as well as two full appeals to the Arizona Supreme Court. All of the post-conviction petitions were summarily denied. Since this court considers it to be futile to return to state court, and accordingly, the exhaustion requirement has been satisfied because of futility, the next step for this court would ordinarily be to require Richmond to establish cause and prejudice for the failure to present these claims to the state courts. If Richmond could not establish cause and prejudice then he would be deemed to have waived these claims. This court is bound by the remand order of the Ninth Circuit. That court's discussion of the issues of abuse of the writ and waiver indicate to this court that it cannot find waiver as to any of these issues.[8] The exhaustion requirement is therefore met and this court will rule on the merits of the petition.

## EVIDENTIARY HEARING

The Ninth Circuit's remand in this case directed this court to determine whether to hold an evidentiary hearing on any of the issues raised in the petition. In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963) the Supreme Court directed that a federal court must hold an

---

**5.** Richmond was present at oral argument.

**6.** The state court record submitted to the court and considered by the court is set forth in the Appendix.

**7.** The court notes that Richmond objects to this procedure. Richmond would prefer that the court wait until a motion for summary judgment is filed before it determines the claims on their merits. The parties have adequately directed the court to the pertinent state court record so that the mere delay until a formal motion is filed would serve no purpose. The court also notes that the facts of this case are not in dispute following this courts review of the state court record, 28 U.S.C. § 2248.

**8.** Among other statements in the Ninth Circuit opinion is the following: "The ends of justice would not be served by denying Richmond appellate consideration of these other constitutional challenges to the death penalty merely because he obtained relief on a different ground" *Richmond v. Ricketts,* 774 F.2d at 960. The court also notes the following statement: "Nothing in the record shows that Richmond purposefully withheld his new arguments in the hope of being granted two hearings instead of one or for some other such reason." *Id.* at 961.

evidentiary hearing on a habeas corpus case if (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing or (6) for any reason it appears that the trier of fact did not afford the habeas applicant a full and fair fact hearing. If these factors are not present, then it is within the discretion of the district court whether or not to hold an evidentiary hearing, *Knaubert v. Goldsmith*, 791 F.2d 722 (9th Cir. 1986).

■ This court has carefully reviewed the entire state court record herein. Richmond seeks an evidentiary hearing with regard to ten of the issues presented in the amended petition. For the reasons set forth in the discussion of each of these issues, the court finds that none of the six reasons for conducting a mandatory evidentiary hearing are present. The claims presented as to several of these issues are wholly conclusory and speculative. Since there is no credible *factual* support for several of these allegations, this court will not conduct a discretionary evidentiary hearing, *Bashor v. Risley*, 730 F.2d 1228 (9th Cir.1984); *see also, Harris v. Pulley*, 692 F.2d 1189, 1199 (9th Cir.1982), *rev'd on other grounds*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In addition, as to some of these claims, the court accepts Richmond's proffer of evidence as being true.[9] Those claims, however, are not sufficient to establish a violation of Richmond's constitutional rights and will not support the relief he seeks from this court.

It is not necessary for this court to conduct an evidentiary hearing with regard to the allegations of this petition. None of the allegations warrant this court exercising its discretion to develop the facts more thoroughly in a discretionary evidentiary hearing. As stated above the court will set forth the specific reasons for denying an evidentiary hearing on each of the issues presented in the petition during the discussion of the merits of each separate claim for relief.

The amended petition asserts eighteen separate challenges for relief and numerous separate underlying factual arguments in support of the eighteen claims. Several of the underlying arguments that Richmond has labeled as "facts" are actually constitutional arguments, rather than just supporting facts, which if established would require the granting of the relief that he seeks here. Accordingly, the court will also address the validity of these underlying claims.

## CHALLENGE TO THE CONVICTION

Richmond's only challenge to his conviction is that there was a lack of proof beyond a reasonable doubt of the crime of first degree murder. This contention is based on several facts. The prosecution presented the case to the jury under both the felony murder rule (because the killing occurred during or immediately after a robbery) and premeditated murder. The instructions to the jury presented both theories. However, no instruction was given that the jury had to reach unanimous agreement as to one theory or the other prior to rendering their verdict. The verdict of the jury did not specify which theory was found. Richmond also contends that there was insufficient evidence to show either theory beyond a reasonable doubt. Neither party seeks an evidentiary hearing on this claim.

In the prior order dismissing this action filed November 5, 1984 this court found

---

**9.** This court is not obligated to accept all of Richmond's proffered facts as true. The factual support for many of Richmond's claims is clearly contradicted by the state court record. Since Richmond challenges only the conclusions of the state courts, and not the underlying factual support, this court will accept those conclusions that are supported by the record. If the record does not establish the facts contradictory to the claims of Richmond or if the record does not establish the facts at all, this court will accept Richmond's proffer as being true.

that any challenge to the conviction, including this claim, was an abuse of the writ of habeas corpus. Richmond had presented the same claim in his first petition for habeas corpus relief in Federal Court and the claim was denied on its merits, *Richmond v. Cardwell*, 450 F.Supp. 519 (D.Ariz.1978). Richmond did not appeal that adverse ruling. The Ninth Circuit upheld the finding of abuse of the writ on this claim and any other claim to the underlying conviction, *Richmond v. Ricketts*, 774 F.2d 957 (9th Cir.1985). This court need not rule on the merits of this claim, however, a decision on the merits of the claim is helpful and necessary in reaching a decision on several of the other issues presented in this petition. It also removes all doubt as to the validity of the conviction.

The standard of review in a habeas corpus action on this claim is whether there is sufficient evidence presented at trial that a rational trier of fact could have found the Defendant guilty of the crime, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The court has thoroughly examined the transcripts of the trial in this matter, Exhibit volumes 4, 5, 6, and 7.

Richmond's claim of lack of evidence under the felony murder rule is based on his contention that the robbery had already ended by the time the killing occurred. Since the killing of Bernard Crummett occurred while the robbers were leaving the scene, it is Richmond's contention that the felony murder rule is inapplicable.

■ Under Arizona law, where the escape is part of one continuous felony transaction, then a killing during the course of the escape is covered by the felony murder rule, *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41, 45 (1976) *citing, State v. Adams*, 339 Mo. 926, 98 S.W.2d 632 (1936).

■ The testimony of Faith Erwin (volume 6, pages 429 to end, volume 7, pages 440–512) was that Crummett was driven to an undeveloped desert location for the robbery. Richmond knocked Crummett to the ground then threw large rocks, approximately six to eight inches long (volume 7, page 442),[10] at Crummett's head. Crummett's pockets were then turned inside out and the robbers returned to their vehicle leaving Crummett lying in the road. As they were driving away, the car ran over Crummett, twice.

The taped statement of Richmond was played for the jury during the trial (volume 7, pages 539–549). During the statement, Richmond admitted participating in the robbery and that the car ran over Crummett as they were leaving the scene immediately after the robbery. This is sufficient evidence for a rational finder of fact to conclude, beyond a reasonable doubt, that Crummett died during the commission of the robbery. Since there was sufficient evidence to establish the conviction under the felony murder theory, this court need not, and will not, determine the issue with regard to the theory of premeditated murder.

■ Richmond contends that his constitutional rights were violated because the court failed to instruct the jury that it must reach unanimous agreement as to one theory of first degree murder before it can render its verdict. There is no merit to this claim.

The Defendant's requested jury instructions appear in Volume 9 of the state court record. None of the requested instructions include a request that the jury reach unanimous agreement as to one theory prior to rendering a verdict. Richmond filed an undated transcript of the trial proceedings with this court on August 29, 1984. That transcript includes, among other things, the hearing on the settlement of instructions (pages 603–628), the court's instructions to the jury (pages 650–668), and the defense objections to the court's jury instructions made after the instructions were read to the jury (pages 673–680). Although the court in fact did not instruct the jury that it must reach unanimous agreement as to one theory or the other, it did

---

**10.** *See, also,* discussion of the size of the rocks in Issue V, *infra.*

instruct the jury that it must reach unanimous agreement as to the charge of first degree murder (page 667).

At two separate times during the trial, the trial court allowed the Defendant to make objections to the jury instructions. Although the second set of objections came after the court instructed the jury, the trial court considered the matter to be timely. At no point in either of these objections did the defense assert any objection to the failure to instruct on the requirement of a unanimous agreement as to the theory of first degree murder.

Arizona law recognizes only one crime of first degree murder. Where alternative theories of a crime are presented, the prosecutor is not obligated to elect which of those theories should be the sole basis of the jury's determination. It is also not error to fail to instruct the jury that one theory or act should be found unanimously, *State v. Encinas*, 132 Ariz. 493, 647 P.2d 624, 627–28 (1982) [multiple theories of murder]; *State v. Counterman*, 8 Ariz. App. 526, 448 P.2d 96 (1968) [two separate acts of assault on one victim but only one charge of assault, prosecutor need not select one act only]; and *State v. Dixon*, 127 Ariz. 554, 622 P.2d 501 (Ariz.App.1980) [two theories of theft presented for one charge of theft].

This court has not been cited to a single case holding that the Constitution of the United States requires unanimous agreement as to one of two alternative theories of proof for a single crime. This court's own research has failed to find any such case. This court concludes that no such constitutional right exists and even if it did, Richmond has waived that right by the failure to make a timely objection to the instructions of the court.

Richmond is not entitled to habeas corpus relief as to the underlying conviction.

## CHALLENGES TO THE DEATH SENTENCE

### I. UNDUE DELAY IN THE IMPOSITION OF THE SENTENCE.

■ Richmond contends that the delay of six years from the arrest to the sentencing was unconstitutional because it was prejudicial due to the great emotional distress he suffered while confined on death row and the inability to locate three witnesses in mitigation at the resentencing.[11] In the amended petition, Richmond identifies the witnesses as Margaret Fraccaro, Becky Corella, and Robert Richmond. In his supplemental proffer of evidence in support of his motion for an evidentiary hearing on this issue, Richmond identifies another witness known only as "Barbara." [12]

In support of his claim that the delay was unjustified, Richmond asserts that he has always challenged the constitutionality of the death sentence. Since he prevailed in his initial habeas corpus petition, he contends that the state was unjustified, prior to that determination, in relying on the death sentencing statute in his case at all.

Richmond seeks an evidentiary hearing on this issue. He seeks to establish prejudice due to the inability to prepare and present mitigating circumstances, the disappearances of the witnesses and the lack of justification for the delay. On January 10, 1986 Richmond filed his supplemental proffer in support of his motion for an evidentiary hearing. In addition to the matters set forth above, he contends that Robert Richmond would have testified concerning Richmond's character and family background, Fraccaro would have testified as to Corella's involvement in the crime (rather than Richmond's) and "Barbara" would also testify to Corella's involvement in the actual killing.

---

11. In his motion for an evidentiary hearing Richmond further contends that the delay was unjustified. Although this claim is not presented in the amended petition, the court will dispose of it on its merits.

12. Richmond admits that he does not know the last name of this witness.

Richmond's claims with regard to the witness Becky Corella are factually without merit. It is undisputed that Corella was involved in this crime and in fact the robbery was probably her idea. She never testified at trial or at the second sentencing hearing. Contrary to Richmond's claim, however, she was available to testify at all times. At the time of the resentencing, Richmond's attorney entered into a stipulation with the prosecutor that the prosecution had provided assistance in locating several witnesses for the defense and in fact had found four witnesses including Becky Corella (volume 18, pages 29–30). She was therefore available to testify at the re-sentencing and the delay caused no prejudice with regard to this witness.

Richmond's other claims under this allegation are legally insufficient to warrant habeas corpus relief and it would be futile to hold an evidentiary hearing on this matter. The court accepts as correct the proffered testimony of the remaining missing witnesses. Initially, the court notes that Richmond does not assert one single mitigating factor that the delay precluded him from presenting and he did not do so before the state courts. There is nothing before this court but speculation that other mitigating circumstances could have been prepared and presented had the delay during the appellate review of this case not occurred. This speculation does not entitle Richmond to the relief he requests.[13]

The court also finds the proffered evidence with regard to the missing witnesses to be insufficient to warrant habeas corpus relief. Accepting Richmond's proffer as correct, Margaret Fraccaro, had she been found, would have testified that Corella had told her that Corella was driving the car when it ran over Crummett. The state

court record establishes that Fraccaro had provided an affidavit to that effect just subsequent to the initial sentencing. That affidavit was submitted in support of the initial petition for relief pursuant to Rule 32, Arizona Rules of Criminal Procedure (volume 12, page 1). At the re-sentencing, the judge accepted the affidavit as evidence in mitigation (volume 20, pages 76–77). Richmond does not assert that Fraccaro would have testified as to anything else concerning mitigation. At oral argument before this court, Richmond conceded that she would not have testified as to anything other than what was in the affidavit.

At the sentencing hearing, other witnesses testified as to statements made to them by both Corella and the only other eye witness/participant in the robbery, Faith Erwin. Daniel McKinney testified at the re-sentencing hearing that Corella had told him that she was driving the car (volume 19, pages 113–139). This was the same evidence he had presented in his initial affidavit that was also a part of the initial Rule 32 petition. Regina Collins testified both at trial (transcript filed by Richmond on August 29, 1984, pages 629–646) and at the re-sentencing (volume 19, pages 41–71) that Erwin had told her that Corella had been driving the car when it ran over Crummett. Also in the record is the affidavit of the prosecutor indicating that at the time of the trial, Corella was willing to take the stand and accept blame for the killing and that Richmond's attorney was aware of this fact (volume 12, page 11, attached to the opposition to the initial petition under Rule 32).

The separate testimony of Fraccaro would have only added one more person to the list of people that Corella had apparent-

**13.** The court also notes that two of the mitigating factors considered by the court at the re-sentencing did not even exist at the time of the initial sentencing. At the re-sentencing, Richmond presented evidence of his change in character during the time of incarceration on death row. No such evidence existed at the time of the initial sentencing. Also at re-sentencing, the trial judge considered the statutory mitigating factor of the Defendant's age at the time the

murder occurred (volume 20, page 118). This statutory mitigating factor was not enacted until well after the initial sentencing.

It should be further noted that during the second appeal to the Arizona Supreme Court, Richmond was asked to identify the prejudice that he suffered during this delay. He was unable to present any evidence of prejudice at that time, *State v. Richmond,* 666 P.2d at 61.

ly told that she had been driving. The evidence would have been cumulative. During the defense presentation of mitigating circumstances the rules of evidence are inapplicable. Even though Fraccaro's testimony would not have been excluded as cumulative, the absence of that testimony does not amount to a constitutional violation. The only statement she had to offer was presented to the court by her affidavit. Richmond is not entitled to habeas corpus relief because Fraccaro could not be located at re-sentencing.

The same conclusion is required as to the claim of prejudice from the inability to locate the witness Robert Richmond, the Petitioner's father.[14] There is absolutely no evidence anywhere in the record as to what testimony he would provide since he neither testified at trial or provided an affidavit. The only proffer of proof as to what he would testify to is to Richmond's character and family background. It is highly speculative that the testimony would have made any difference.

During the re-sentencing hearing, Richmond called numerous witnesses to the stand concerning both his family background and his character both before and after his stay on death row. Among those witnesses were his sister, Ruby Phelps (volume 19, pages 14–28); his brother-in-law, William Phelps (volume 19, pages 28–34); his aunt, Lenore Collins (volume 20, pages 51–54); his sister, Katie Ruth Brown (volume 20, pages 63–68); his mother, Katie Mae Patterson (volume 20, pages 68–73); and his step-father, Arthur Patterson (volume 20, pages 60–62). These witnesses testified about Richmond's family background, family support, impact upon the family in the event of execution and his change in character during his incarceration.

Richmond does not allege and this court's review of the record does not indicate that any of the absent witnesses were not located due to actions by the prosecutor or anyone else. The mere passage of time and the witnesses apparent mobility resulted in both sides being unable to locate these witnesses. Since it is speculative as to what Robert Richmond would have testified to and the only proffered testimony is that of general family background and character, which would be cumulative, there was no prejudice to Richmond sufficient to warrant habeas corpus relief from the inability to locate this witness.

The proffer as to "Barbara" is the same as with the statements of Fraccaro, Collins, and McKinney. The passage of time precluding the locating of a witness that Richmond did not even know by last name is wholly insufficient to warrant the relief sought here.

■ Richmond's claim that the delay here was unjustified is without merit.[15] Until a court of competent jurisdiction determines a law to be unconstitutional, the state is justified in relying on and enforcing it unless it is clear that the law will be invalidated based on previous case law. Although Richmond contended from the beginning that the death sentencing statute was invalid, it was not ruled so until Richmond's petition for writ of habeas corpus was decided in 1978, *Richmond v. Cardwell*, 450 F.Supp. 519 (D.Ariz.1978).[16] At the time that decision was rendered, the law on that issue was still unclear. Shortly thereafter, the United States Supreme Court clarified the law by its decision of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The Arizona Supreme Court's decision in *Watson* followed almost immediately thereafter.

---

**14.** The pleadings in this court and in the state court refer to Robert Richmond as being the Petitioner's brother. At oral argument in this case, Richmond informed the court that it was in fact his father.

**15.** The court notes that almost one year of the delay was caused by Richmond's repeated requests to continue the re-sentencing hearing,

*see,* transcripts contained in volumes 15, 16, and 17.

**16.** It should be noted that the statute was held invalid based on only one of the several reasons Richmond asserted for its invalidity. The remaining challenges to the statute were rejected by the court.

There is nothing in Richmond's proffer warranting the conclusion that any delay here was unjustified or that the statute was so clearly invalid that the use of it was clearly a consitutional violation. The court finds that the delay here was not "unjustified" as a matter of law and no evidentiary hearing is needed on this issue.

The court further notes that there has been nothing presented to the court indicating that Richmond has a constitutional right to a speedy sentencing. Although under certain facts such a right could conceivably be found, the facts of this case do not warrant this court's establishment of such a right. As the United States Supreme Court recognized in a case where eight years lapsed between arrest and sentencing: "Virtually all of the delays of which the petitioner claims occurred in the course of appellate proceedings and resulted either from the actions of the petitioner or from the need to assure careful review of an unusually complex case." *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 2009–2010 n. 4, 20 L.Ed.2d 1047 (1968).

Richmond's claims concerning the emotional distress he suffered while being confined on death row have nothing to do with regard to his claim of prejudice in his ability to present mitigating factors. Richmond was represented the entire time by counsel. Whether the conditions of confinement on death row cause emotional distress, or not, will not support an invalidation of the death sentence under this allegation of the petition which challenges the delay and prejudice from that delay in the presentation and preparation of mitigating factors.

The record reflects that Richmond suffered no prejudice from his inability to locate the witnesses he identifies here. The testimony that Richmond claims would have been presented is cumulative and some of that testimony was presented by affidavit. It is merely speculative whether or not Richmond suffered any inability to present or prepare mitigating circumstances. The delay in this case was not unjustified and was not unconstitutional. Richmond therefore is not entitled to a granting of the writ of habeas corpus based on this allegation.

## II. USE OF A "PRIOR" CONVICTION AT RE–SENTENCING.

■ Richmond contends that the introduction of a conviction for first degree murder and the sentence of life imprisonment on that conviction, at the time of the re-sentencing violated various of his constitutional rights. Among those asserted rights are the right to be free from double jeopardy and the arbitrariness of the Arizona Supreme Court's decision on this issue. Neither side requests an evidentiary hearing on this issue. The facts are not in dispute and this is only a legal issue for which no evidentiary hearing is appropriate.

As stated in the facts, at the time of his arrest on this charge, Richmond had already been arrested on two other unrelated charges of first degree murder. As to one of those charges, Richmond was acquitted. The trial on the other charge occurred after Richmond was sentenced in this case. On August 9, 1974 Richmond was convicted of that charge and sentenced to life imprisonment. It is not disputed that the killing that was the basis of the conviction occurred prior to the murder of Bernard Crummett. In fact, at the time of that murder, the death sentence had not yet become effective so that the sentence of life imprisonment was the only possible sentence.

At the initial sentencing hearing, no evidence of this crime was presented as an aggravating factor and the sentencing judge specifically found it not present. At the re-sentencing, however, the prosecution offered evidence of this conviction to establish the aggravating factor in A.R.S. § 13–454 (E)(1) [17] (volume 18, pages 72–75). The

---

**17.** A.R.S. § 13–454(E) provides in part:

Aggravating circumstances to be considered shall be the following:

court found that aggravating factor to exist (volume 20, pages 116–17).

Richmond contends that since the prosecutor could have presented evidence of this crime at the time of the initial sentencing but chose not to do so, the court's initial determination that this aggravating circumstance was not present would therefore be an acquittal. Richmond contends that to allow the state to introduce this evidence at the re-sentencing violated his rights to be free from double jeopardy. This is based on Richmond's claim that the re-sentencing occurred over his objection and was not at his request.

Richmond is not entitled to relief on this claim. A similar issue to this one was presented to the Ninth Circuit in *Knapp v. Cardwell*, 667 F.2d 1253, 1264–65 (9th Cir. 1982) in which Richmond was a party. In that case, the Ninth Circuit rejected the claim that the *Watson* remand for a new hearing on both aggravating and mitigating factors would constitute double jeopardy. The recent Supreme Court decision in *Poland v. Arizona*, — U.S. —, 106 S.Ct. 1749, 90 L.Ed.2d — (1986) disposes of this issue.

Richmond is incorrect in his claim that the prosecution could have presented evidence of the other murder at the initial sentencing hearing.[18] The statute requires a *conviction* to have occurred prior to the other crime being considered as an aggravating factor. It is undisputed that no conviction occurred on that charge until after the initial sentence of death was imposed.

The record also establishes that the prosecutor could not have presented evidence concerning that crime even if he had tried to do so. Very early in the initial sentencing hearing, the court notified the parties that he would not consider any evidence

concerning either of the other pending murder charges. The judge stated:

> Along the same line, I think the record should show that I am disregarding anything concerning two pending murder charges against the defendant. And the police reports and statements in those other two cases; copies of those were made available to the Court by the probation officer during the presentence report. But I returned them to the probation officer without reading them.
>
> I have not read matters concerning the other two cases. Anything concerning those two cases will be disregarded at this hearing.

Volume 11, page 13.

The record indicates that rather than finding that the prosecutor had failed to prove this aggravating circumstance, the court found it absent as a matter of law and refused to consider this evidence at all. Although Richmond contends that he did not ask for the re-sentencing, it was his actions in filing a petition for writ of habeas corpus that resulted in the new hearing. There has never been a determination at any time that the sentence of death was not appropriate. Although there has been some change in the underlying support for the imposition of the death sentence, the sentence itself has not been held inapplicable. Under the holding of the *Poland v. Arizona* case, *supra*, that "wiped the slate clean" as to the presentation of this aggravating circumstance. *See, also, Staatz v. Dupnik*, 789 F.2d 806 (9th Cir.1986). Richmond's constitutional right to be free from double jeopardy has not been violated.

Richmond contends that the decision in this case is inconsistent with other decisions on the same issue by the Arizona Supreme Court. At oral argument on this issue, Richmond conceded that the only

---

(1) The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

18. At oral argument in this case, Richmond contended that the prosecutor should have tried the other cases first and then the case involving

Bernard Crummett. If this had occurred then Richmond could not make any objection to this aggravating circumstance. The Constitution imposes no such requirement. There is no dispute that Richmond had already been convicted and sentenced for the prior homicide at the time of re-sentencing.

case he could cite to the court decided by the Arizona Supreme Court was *State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020, 1035–36 (1981). In *Ortiz*, the prosecutor had offered as an aggravating circumstance a conviction for conspiracy to commit murder. The conviction had been entered simultaneously with the conviction for first degree murder. In fact, there were numerous convictions from one trial and all of the charges arose from one incident involving several persons. The Supreme Court held that the simultaneous conviction could not be used as an aggravating circumstance. The language used in *Ortiz* is far sweeping, but was narrowed by subsequent decisions, *see, State v. Gretzler*, 659 P.2d 1, 16 n. 2 (1983).

*Ortiz* is clearly distinguishable from this case. Richmond's prior conviction stems from an entirely separate incident and the trials were not conducted together. The subsequent limitation on the language in *Ortiz* removes any inconsistency between the two holdings. This claim is without merit.

## III. DENIAL OF IMPARTIAL SENTENCING AUTHORITY.

Richmond contends that the judge who imposed the sentence of death against him, Richard Roylston, was biased against him. Judge Roylston had presided over the trial and over both the initial sentencing and the re-sentencing. Richmond alleges that Judge Roylston was biased because of the mitigating evidence presented at the first sentencing, because he had heard extrajudicial information that he had been exposed to following the initial sentencing and prior to the remand for new sentencing, and by his knowledge of the appellate process.

Richmond seeks an evidentiary hearing in order to establish the "extra-judicial" prejudicial information that Judge Roylston was exposed to. In his Supplemental Proffer of Evidence in support of an evidentiary hearing on this issue, Richmond raises six arguments. He contends that during the period between the first sentencing and the second hearing, there was widespread publicity and public comments, particularly among the legal profession concerning Richmond and other criminal behavior he may have engaged in. Richmond contends that since the judge was under no obligation to refrain from hearing these comments during this period and since the publicity and comments were "sufficiently widespread" that "it is probable that Judge Roylston was exposed to it" and presumably became biased by it.

To prevail on a claim of bias by a state judge in a habeas corpus action, the Petitioner must actually establish bias or prejudice on the part of the judge or if "realistically considering the psychological tendencies and human weaknesses, the judge would be unable to hold the proper balance between the state and the accused," prejudice may be presumed, *Dyas v. Lockhart*, 705 F.2d 993, 996–97 (8th Cir. 1983). Factors warranting a presumption of prejudice include whether or not the judge has a pecuniary interest in the outcome of the trial or whether the judge has been the target of personal abuse or criticism from one of the parties. *Id. see, also, Aetna Life Insurance Co. v. Lavoie*, —— U.S. ——, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). These factors are not present here and the allegations of bias are not of such a level to warrant the presumption of bias. To prevail here, Richmond must establish actual bias or prejudice.

Richmond's contention of Judge Roylston's exposure to "extra-judicial" information does not warrant any relief from this court nor does it require an evidentiary hearing. The sole contention in support of this claim is that publicity and public comments were so widespread that Judge Roylston "probably" was exposed to it. There are no *facts* offered to show, in fact, Judge Roylston was exposed to any information. In addition, Richmond has not presented to the court one single piece of evidence concerning what the prejudicial publicity and comments were. Richmond conceded at oral argument before this court that it is only speculative whether or not Judge Roylston was exposed to any "extra-judi-

cial" information at all. He stated that he has no evidence of actual exposure to any such information. This court has nothing before it to even indicate bias here except Richmond's unsupported speculative and conclusory allegation. This is wholly inadequate to support granting of an evidentiary hearing on this claim, *Bashor v. Risley*, 730 F.2d 1228 (9th Cir.1984). *See, also, Harris v. Pulley*, 692 F.2d 1189, 1199 (9th Cir.1982). An evidentiary hearing in a habeas corpus case is for the purpose of determining whether any constitutional rights have been violated, not for speculation or fishing expeditions. Richmond has failed to present any support for this claim and he is not entitled to relief based on it.

Richmond's next contention is that Judge Roylston was biased against him because of the mitigating evidence offered at the initial sentencing. The mitigating evidence presented at the first sentencing (volume 11) was testimony by psychiatrists that Richmond was a sociopath, a person who understands right from wrong but acts in a manner consistent with his immediate needs regardless of whether it is right or wrong and that he does not learn from experience. Other statements of his character that were not very complimentary were made by the mitigation witnesses.[19]

In July, 1979, prior to the re-sentencing, Richmond filed a motion to disqualify Judge Roylston based upon the evidence offered in mitigation at the initial sentencing (volume 21). That motion was presented to Presiding Judge Harry Gin. On August 6, 1979, Judge Gin heard the arguments based on that motion (volume 15). Counsel at that hearing argued that to allow Judge Roylston to conduct the second sentencing after having been exposed to the prior evidence would preclude the judge from being able to decide whether Rich-

mond's character had changed during incarceration. The prosecutor argued that the evidence may be presented to the court no matter what judge presided over the hearing, since it would be rebuttal evidence to Richmond's claim of character change. Judge Gin denied the motion by minute entry filed August 13, 1979 (volume 21) holding that Richmond had failed to establish bias. At the hearing before Judge Gin, Richmond did not seek to have any testimony heard on this matter. Rather, he relied solely on his argument that the re-sentencing would be influenced by the previous evidence offered by Richmond.

The decision of Judge Gin on this matter was affirmed on appeal, *State v. Richmond*, 136 Ariz. 312, 666 P.2d 57, 61–62 (1983). The court noted that at the time of the re-sentencing, A.R.S. § 13–454(A) required the judge who presided over the trial to conduct the sentencing. The court also agreed with the prosecutor that *any* judge who conducted the re-sentencing would be exposed to this same testimony and therefore, Richmond had failed to establish bias.

Richmond presents nothing further than what was already presented to the state courts and does not request an evidentiary hearing to present further information on this issue. This court has reviewed the transcript of the initial sentencing hearing, the pleadings concerning the motion to disqualify the judge,[20] the transcript of the hearing on that motion and the transcripts of the re-sentencing. The evidence presented at the first sentencing hearing, in mitigation, certainly did not cast Richmond in a good light unless that information is considered for the purpose in which it was offered, as an attempt to meet A.R.S. § 13–454(F)(1) [capacity to conform

---

**19.** The Arizona Supreme Court summarized this testimony as stating that a sociopath is a person "who never learns from experience, has poor impulse control, has a lack of moral insight and shows very little guilt. The psychiatrists characterized [Richmond] as callous, grossly selfish, irresponsible and impulsive." *State v. Richmond,* 666 P.2d at 62. They also testified at the

first sentencing that only age would cure this character problem.

**20.** Richmond actually filed two separate motions to disqualify Judge Roylston. The second motion was based on the Judge's conducting an *in camera* inspection of Richmond's prison file. Richmond does not challenge the determination of that matter as part of his claim of bias here.

his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution].

Nevertheless, this court's review of the re-sentencing record before it requires the conclusion that this evidence played no part in Judge Roylston's imposition of the sentence of death. Merely being exposed to unfavorable information, five years prior to conducting a re-sentencing, in the same case, does not warrant a finding that Judge Roylston was biased or prejudiced against Richmond.

Richmond's next claim under this allegation is that the judge's knowledge of the appellate process in this case made him biased. Apparently, this contention is that since the prior conviction was reversed Judge Roylston would be biased since it was his decision that was reversed. There has been nothing cited in the record, and this court's review of the record could not locate, any animosity by Judge Roylston against Richmond based on the reversal of the conviction or anything else. The conviction in this case was reversed because the law under which the sentencing was conducted was declared to be unconstitutional. Judge Roylston's conduct at the initial sentencing were not responsible for the reversal. For this court to hold that mere reversal of a decision creates bias by the judge on remand would require the conclusion that every judge in this country has, at one time or another, presided over a proceeding improperly because of his bias. The constitution and the facts of this case do not warrant such a conclusion.

▮ A judge is presumed to be honest and act with integrity, *Dyas v. Lockhart*, 705 F.2d 993, 997 (8th Cir.1983); *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). None of the claims presented under this allegation are sufficient to overcome this presumption. Richmond is not entitled to relief on this claim.

## IV. LACK OF NOTICE OF AGGRAVATION.

▮ Richmond contends that his fifth and sixth amendment rights were violated when the prosecutor failed to give notice of what aggravating circumstances he would rely on at sentencing. He contends that since prior convictions were used, Rule 19.2 of the Arizona Rules of Procedure required disclosure as well. In addition, he contends that since there was no clear definition of one aggravating factor or notice of what kind of prior convictions could be used then Richmond was unprepared to rebut this evidence. He seeks an evidentiary hearing on this allegation to establish the prejudice he suffered in the presentation of rebuttal evidence. Richmond has not identified to this court any rebuttal evidence that was not presented at the state court re-sentencing hearing due to the lack of notice of the aggravating circumstances. The request for an evidentiary hearing is based solely on the conclusory allegations of the petition and must be denied.

Respondents address the merits of this claim as to both the initial sentencing and the re-sentencing. The initial sentence of death was set aside and any claims presented under this allegation as to the invalidity of the initial sentencing are moot. That also applies to the claim as to the "cruel, heinous or depraved" aggravating circumstance. Richmond was one of the first people sentenced under the current Arizona death sentencing statute and at the time of the initial sentencing there had been no interpretation or definition of that factor. However, at the time of the re-sentencing there was substantial case law interpreting the limits of that provision. Richmond is therefore not entitled to relief on this basis.

▮ Richmond's assertion concerning the failure to comply with Rule 19.2 does not support the granting of relief here. A failure of the state court to follow its own rules will support habeas corpus relief only if it is of such a magnitude as to result in a denial of federal due process, *Hines v. Enomoto*, 658 F.2d 667, 672 (9th Cir.1981). The mere failure to comply with the rule does not warrant relief separately from the constitutional challenge presented here.

The court also notes that Richmond does not specify whether the Rule he cites is under the Criminal or Civil Procedural Rules. This court has examined both and can find no rule requiring disclosure in a sentencing hearing.[21] Rule 19.2 of the Criminal Rules discusses the right of the Defendant to be present at all stages of the trial. Rules 15.1(a)(5) and 19.1(b) discuss prior convictions but not for the proposition that Richmond asserts to this court. This court has been unable to find the rule that Richmond refers to after a thorough review of the Arizona procedural rules. It must be concluded that no such rule exists.

This court's review of the state court record also requires the finding that Richmond's claim that he did not receive notice of the aggravating factors to be factually without merit. At the initial sentencing hearing (volume 11), the prosecutor offered evidence of aggravating circumstances A.R.S. § 13–454(E)(2), (E)(5) and (E)(6). These concern prior convictions for a crime involving harm or threat of harm to another, commission of the murder in consideration for anything of pecuniary gain, and commission of the crime in an "especially cruel, heinous or depraved" manner, respectively. The court found factors (E)(2) and (E)(6) present. The Arizona Supreme Court affirmed that conclusion on appeal, *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976).

At the re-sentencing (volume 18), the prosecutor asserted the same aggravating circumstances and the same evidence against Richmond as to those circumstances. The only change was that the prosecutor also alleged and the court found aggravating circumstance (E)(1), that the defendant had previously been convicted of an offense where a sentence of life imprisonment could have been imposed. This pertained to Richmond's subsequent conviction of the first degree murder that occurred prior to the murder of Bernard Crummett.

The record also reflects a direct indication that Richmond's attorney at re-sentencing had been notified of what aggravating circumstances would be presented. At the beginning of the sentencing, defense counsel objected to the entire proceedings. He then made the following statement concerning his ability to prepare for the hearing. "I might also say that after having been told by Mr. Howard [the prosecutor] that he wishes to present as an aggravating factor a prior conviction from Case No. A–17969 [a kidnapping involving the use of a knife], that I went to the court files and found that the case was on microfilm." (volume 18, page 23). The prosecutor presented evidence under circumstance (E)(2) involving the kidnapping conviction. The prosecutor at the re-sentencing here asked the victim in that case if he could identify Richmond and the defense counsel objected because at the underlying trial on the charge, the witness' identification had been suppressed because of an unduly suggestive pre-trial procedure (volume 18, pages 56–57).

Counsel also contended that the introduction of the subsequent conviction for the prior offense was invalid at the re-sentencing. At that time he argued that the case of *State v. Valencia*, 124 Ariz. 139, 602 P.2d 807 (1979), was incorrect. *Valencia* was the state court decision which upheld the validity of introducing subsequent convictions during re-sentencings. Richmond's attorney was therefore aware of the *Valencia* holding at the time of the re-sentencing in this matter and knew of its impact on this case. The Ninth Circuit upheld the validity of this ruling in *Knapp v. Cardwell*, 667 F.2d 1253, 1265 (9th Cir. 1982), the class action suit in which Richmond was a party. The court also notes that at the time of the re-sentencing and at the time of the initial sentencing, that the Arizona death penalty statute, A.R.S. § 13–

---

**21.** In *State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020 (1981) the Supreme Court of Arizona imposed such a requirement under Arizona law. This decision was rendered after Richmond's re-sentencing hearing.

454(E) provided for a total of only six specific aggravating circumstances.[22]

This court finds that based on these facts, Richmond had sufficient notice of the factors that would be introduced as aggravating circumstances so as to satisfy the requirements of the constitution. There is no merit to this allegation.

## V. EXCESSIVENESS OF PETITIONER'S DEATH SENTENCE.

■ Richmond contends that the death penalty is inappropriate in this case because there was no finding by the *jury* that Richmond killed or intended to kill the victim and there was insufficient evidence to establish this at trial. Richmond further contends that evidence that he did not kill was held to be irrelevant to the sentencing and rejected by the court as a mitigating factor. Neither side has requested an evidentiary hearing on this issue. Other than a thorough review of the state court record, there is no right to an evidentiary hearing on this allegation.

Richmond is correct that there was no finding by the jury that he killed or intended to kill Bernard Crummett. Since the case was presented to the jury under both premeditated murder and the felony-murder rule, the jury's verdict of guilty could be as to either theory. Richmond is not entitled to relief on this claim, however.

The Supreme Court held in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that the sentence of death was inappropriate unless there was a finding that the particular defendant did kill, attempted to kill, intended that a killing take place or that lethal force would be employed. The Supreme Court recently refined that holding in *Cabana v. Bullock,* —— U.S. ——, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). The court held that the federal courts must carefully examine the state court record to determine if there was a finding by any state court that would satisfy the *Enmund* requirement. That determination need not be made by the jury and if such a finding was made, it is entitled to the presumption of correctness, *Id.* at 698.

This court has carefully reviewed the state court record in this matter. The Arizona Supreme Court held that the trial court was correct in its conclusion that Richmond did kill Crummett and the Supreme Court also found that Richmond intended to take a life, *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57, 63 (1983).

Richmond has presented no facts to support his claim that this factual determination is not correct. The only facts that this court could find in the state court record are the statements found in affidavits and testimony by various persons who were told by Corella and Erwin that it was Corella who was driving the car when it actually ran over Crummett. There is nothing in the record at all to challenge the finding that Richmond intended to kill Crummett.

The facts upon which the Arizona Supreme Court relied in making this conclusion are the testimony of Faith Erwin and the statement of Richmond. From both those statements it is clear that Richmond drove Crummett to the undeveloped desert location in order to rob him. As soon as Crummett exited from the car, he was struck to the ground by Richmond and rendered unconscious. Richmond then picked up at least two rocks and threw them at Crummett's head striking him. Despite the massive injury to the victim's head from the car tire, the medical testimony at trial was that the injuries from the rocks were visible although the blows themselves did not cause the death. After inflicting the wounds with the rocks and emptying the victim's pockets, the victim was left lying in the street.

Richmond has submitted pictures of the rocks that were exhibits at trial (Motion to Expand the Record, filed July 9, 1986) and has directed this court's attention to a map of the crime scene made by police that was also a trial exhibit (Volume 8, page 12).

---

**22.** Under the current statute, A.R.S. § 13–703(F) there are nine statutory aggravating circum- stances.

The photographs of the rocks are of two blood stained rocks found at the scene of the crime and believed to be the ones used by Richmond to strike Crummett. The rocks were described at trial as being six to eight inches long. No objection was made to that description, although the jury had the rocks themselves. The rocks in the photographs are somewhat smaller than that description. One rock is six inches long. The other appears to be about four inches long. Richmond's present attorney has submitted an affidavit as to the weight of the rocks. The larger rock is just under one and a half pounds while the smaller rock weighs twelve and a half ounces.

Richmond contends that this evidence establishes that the Arizona Supreme Court's finding that Richmond intended to kill Crummett is not supported by the record. These changes in the facts, if in fact it does change the facts, fail to overcome the presumption of correctness which this court is obligated to provide the finding of the state court, *Cabana v. Bullock,* 106 S.Ct. at 698. This court is not permitted to conduct a *de novo* review of this evidence. It is limited to a determination of whether there are sufficient facts in the record to support the finding of the Arizona state courts.

There is adequate evidence in the record to support the Supreme Court's finding that Richmond intended to kill Bernard Crummett. This court need not determine whether there was sufficient evidence to support the conclusion the Richmond actually killed Crummett.[23] Under the constitutional challenge here, the failure of the jury to make the finding that Richmond challenges here does not entitle him to relief in this court.

■ Richmond's claim that the sentencing court considered the evidence concerning his lack of involvement in the actual killing to be irrelevant does not entitle him to relief in this action. Although a court may not exclude any type of mitigating evidence concerning Richmond's lack of involvement in the crime, it is within the sound discretion of the trial court to determine what weight that evidence should be given as a mitigating circumstance, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The state courts concluded that Richmond did in fact kill Bernard Crummett. This court has held that the conclusion that Richmond intended to kill Bernard Crummett is a constitutionally appropriate finding. Accordingly, this court cannot find an abuse of discretion in giving no weight to this evidence as a mitigating circumstance. Richmond fails to present a constitutional violation with regard to this allegation and accordingly, he is entitled to no relief from this court based on the allegation.

## VI. UNCONSTITUTIONAL BURDEN OF PROOF.

■ Richmond contends that placing the burden on the Defendant in this case to establish mitigating circumstances "sufficiently substantial to call for leniency" is a violation of his constitutional rights under the eighth and fourteenth amendments. Under this allegation, Richmond also challenges the validity of the death sentencing statute since it does not require a finding, beyond a reasonable doubt, that the death sentence is appropriate in a particular case. He asserts that such a finding is required in almost every other death penalty statute. This is solely a question of law. No evidentiary hearing is sought by either side and none is needed.

Under the Arizona death sentencing provisions applicable to Richmond, the sentence of death is considered only after a conviction on the charge of first degree murder, A.R.S. § 13–454(A). Richmond was found guilty of the crime of first degree murder by a jury. At a separate

---

23. On June 30, 1986, Richmond submitted his "Supplemental Proposed Findings of Fact In Light of *Cabana v. Bullock.*" The facts submitted in that pleading are almost completely inconsistent and contradictory to the facts of the trial in this case. Either counsel has misread the transcripts of the trial or has chosen to misstate the facts to this court.

hearing before the judge alone, the prosecutor must prove, beyond a reasonable doubt, at least one of the six aggravating circumstances enumerated in the statute.[24] After the prosecutor has established at least one of the aggravating circumstances, the Defendant may then present mitigating circumstances. If the Defendant establishes mitigating circumstances, by a preponderance of the evidence, sufficiently substantial to call for leniency, then the Defendant receives the sentence of life imprisonment, A.R.S. § 13–454(D). If the Defendant fails to present mitigating circumstances calling for leniency then the sentence of death is imposed. The Defendant is permitted to prove any mitigating circumstances he chooses and is not bound by the rules of evidence in his proof. In the event that a sentence of death is imposed, an automatic appeal is filed with the Arizona Supreme Court, Rule 26.15, Arizona Rules of Criminal Procedure. On appeal, the Supreme Court conducts an examination of the entire record for fundamental error in addition to those issues raised by the appellant, *State v. Blazak,* 114 Ariz. 199, 560 P.2d 54 (1977) This was the procedure followed in this case.

As the Supreme Court of Arizona stated in this case, the reason for placing the burden on the Defendant to establish the mitigating circumstances is that these factors are "peculiarly within the knowledge of a defendant." *State v. Richmond,* 666 P.2d at 61. Richmond presented a considerable amount of evidence in support of mitigation. There was testimony from many of his family members as well as Richmond's friends concerning the support that he gives them and the concern he has for their lives. To require the prosecutor to prove in advance of their presentation that these factors do not exist would be an impossible burden of proof. These factors were all relevant to the question of mitiga-

tion and were peculiarly within the knowledge of the Defendant.

The Eleventh Circuit has discussed the purpose of mitigating circumstances in a death penalty sentencing proceeding. "Mitigating circumstances are offered during the penalty phase to show the totality of the circumstances. The evidence is offered to show that the circumstances warrant less than the penalty of death." *Songer v. Wainwright,* 733 F.2d 788, 792 (8th Cir.1984), *vacated,* 758 F.2d 552 (1985); *reinstated,* 769 F.2d 1497 (1985); *rev'd on other grounds,* 769 F.2d 1488 (11th Cir. 1985), *quoting, Songer v. Wainwright,* 423 So.2d 355, 356 (Fla.1982). Requiring the Defendant to establish mitigating evidence, by proof at the level of a preponderance of the evidence,[25] of circumstances within his personal knowledge that call for leniency after the prosecution has proved the crime of first degree murder and that the sentence of death is appropriate is not an unconstitutional burden of proof.

This court concludes that the Arizona death penalty procedures prevent the arbitrary, discriminatory or freakish application of the sentence of death. Discretion is limited in that the prosecutor is limited to a specified number of specific aggravating circumstances and the prosecutor must meet the burden of proof "beyond a reasonable doubt." The procedures then permit the individual Defendant to establish the facts that are particular to his own situation so as to warrant leniency in the imposition of sentence. The Supreme Court then conducts an almost *de novo* review.

Since the Arizona death sentencing procedure passes constitutional challenge, Richmond's claim that the statute is invalid because it does not require a separate determination that death is appropriate under the circumstances and that the court state that it is convinced, beyond a reasonable

---

**24.** As stated before, A.R.S. § 13–703(F) now provides for nine aggravating circumstances.

**25.** Under Arizona law, a "preponderance of the evidence" means that the existence of the contested fact must be shown to be more probable

than the none existence of that fact, *Matter of the Appeal in Maricopa County Juvenile Action No. J–84984,* 138 Ariz. 282, 674 P.2d 836 (1983); *Cole v. Town of Miami,* 52 Ariz. 488, 83 P.2d 997, 1001 (1938).

doubt, that the mitigating circumstances do not call for leniency is without merit. Although these additional procedures would provide further protection against the arbitrary, discriminatory, and freakish application of the death sentence, this court has no authority to order the state to provide them. The statutory scheme as it presently stands is valid under the constitution.

Richmond's claim that these requirements should be imposed because they are found in almost every other death penalty procedure in this country does not entitle him to the relief here. The United States Supreme Court has rejected the requirement that every death sentencing statute be identical in order for it to be constitutional, *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984) ["there is [no] one right way for a State to set up its capital-sentencing scheme."]. Such facts do weigh in the process of determining the constitutional validity of a death sentencing statute, *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 3373–74, 73 L.Ed.2d 1140 (1982). The Arizona statute is constitutional in other respects and this factor does not call for a determination of unconstitutionality. Richmond is not entitled to relief based on this allegation.

## VII. DENIAL OF JURY TRIAL ON FACTS.

■ Richmond next contends that his sixth and eighth amendment rights were violated because he was denied a trial by jury on aggravating circumstances. He contends that every state with a death sentence except four allow for jury consideration of aggravating factors and the reason that Arizona does not provide a jury at this stage is because of a misinterpretation of the requirements of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1974).

■ The reasons that the Arizona legislature removed the requirement of a jury from capital sentencing determinations fol-

lowing *Furman* is irrelevant to whether such a right is required under the constitution. What Richmond fails to mention is that in most of the states with jury participation in the death sentencing, the participation is advisory only. There is no constitutional right to a jury determination in sentencing matters provided the procedures followed adequately protect against the arbitrary, discriminatory and freakish application of the death sentence, *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). The Arizona procedures adequately protect from such a determination. Richmond does not establish a constitutional violation from this allegation and is not entitled to relief from this court based on it.

## VIII. DENIAL OF JURY SENTENCING.

Richmond contends that his constitutional rights were violated because he was denied a jury trial on mitigating circumstances. He contends that judges are more inclined to impose the death sentence than juries and more inclined to impose the death sentence on minority Defendants convicted of killing white victims.

Richmond seeks an evidentiary hearing to establish the racial composition of the Arizona bench as well as other improper considerations made in death penalty cases by judges. None of the factors which he proffered concern particular application of these improprieties to his sentence in particular. In fact, the only allegation directly involving Judge Roylston is that he has imposed the death sentence frequently and more times than other Arizona judges against black Defendants.[26] Richmond conceded at oral argument that there is no merit to this allegation.

One of Richmond's prior attacks on his sentence of death in this action (Issue III, *supra*) was a claim that Judge Roylston was biased and prejudiced against him. None of the facts listed in that challenge

---

**26.** From the statistics submitted by Richmond in support of his claims concerning the patterns of racial discrimination in the imposition of the death sentence, there appears to be only six black inmates on death row in Arizona.

concerned his race. In addition, the court notes that Richmond has not presented a single fact to indicate how frequently Judge Roylston has imposed the death sentence, how many black Defendants have appeared before him in capital cases, how many times in Arizona the death sentence has been sought against black Defendants, or any other facts in support of this argument. There is nothing before the court but a speculative conclusory argument. It does not warrant an evidentiary hearing and is inadequate to warrant relief in this action.

Richmond's separate claim that he is entitled to a jury determination of mitigating circumstances is without merit, *Spaziano v. Florida, supra.* Richmond is not entitled to relief based on this allegation.

## IX. STATUTORY RESTRICTION ON MITIGATING CIRCUMSTANCES.

Richmond alleges that the limitation on mitigating circumstances present at the time of his initial sentencing violated his eighth and fourteenth amendment rights. He further contends that Judge Roylston was "influenced" at the second sentencing by the first sentence of death and the public reaction to that sentence. Neither side requests an evidentiary hearing on this allegation. The facts are not in dispute and this is basically a question of law to which no evidentiary hearing is warranted.

This claim is wholly without merit. The claim of "influence" is nothing more than a restatement of Richmond's claim that Judge Roylston was biased against him because of the evidence at the initial sentencing, Issue III, *supra.* This court agrees that the first sentence of death was unconstitutional because of the limitation on mitigating circumstances. That is the precise reason that the writ of habeas corpus was granted in the first petition before the court, *Richmond v. Cardwell,* 450 F.Supp. 519 (D.Ariz.1978).

There was no limitation on the presentation of mitigating circumstances at the re-sentencing in this matter and Richmond does not allege that there was. The re-sentencing hearing in this matter cured the constitutional defect. The court's examination of the two sentencing hearings requires the conclusion that the only similarity between the first and second sentencings is that most of the proffered aggravating circumstances were the same and the ultimate conclusion that Richmond should be executed was the same. There is no other connection between the two sentencing hearings indicated in the record nor does Richmond assert any support for his claim that the initial improper sentencing hearing interfered with the second sentencing. Richmond is entitled to no relief on this claim.

## X. FAILURE TO CONSIDER MITIGATING FACTORS AT RE–SENTENCING.

Richmond contends that the sentencing judge failed to consider the evidence he presented in mitigation. He contends that although state law required a listing of the mitigating circumstances, the judge failed to do so. Among the factors that Richmond contends were not considered were the following: (1) Richmond's cooperation with the police; (2) the lack of a jury finding that the killing was premeditated; (3) the evidence that Richmond did not kill; (4) the unequal treatment of Richmond relative to his co-defendants; (5) the existence of a mental defect that impaired Richmond's ability to conform his conduct to the requirements of the law; (6) the uncontroverted evidence that Richmond's character had markedly changed during his stay in prison; and (7) the effect the execution would have on his minor son.[27] Neither side has requested an evidentiary hearing on this allegation. The court's review of

27. Richmond also contends that "other factors" were not considered. He does not identify what possible other factors these could be and this court's review of the record does not indicate any other circumstances that should have been considered. Richmond presented additional mitigating circumstances than those discussed in this action. He makes no separate challenges as to the decision to give those circumstances little or no weight.

this allegation is solely a review of the state court record. No evidentiary hearing is therefore appropriate.

The Constitution prohibits the imposition of a sentence of death where the Defendant's proffered mitigating evidence concerning his character, his level of involvement in the crime or any other relevant mitigating evidence is not considered at the time the sentence is imposed, *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The state court, however, has great discretion to determine how much weight any mitigating evidence should receive, *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The state court may not refuse to consider or be precluded from considering "any relevant mitigating evidence." *Skipper v. South Carolina*, — U.S. —, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986). This court's review of the state court decisions in this matter and the sentencing hearing transcripts (volumes 18, 19, and 20) found no constitutional violation under this allegation nor any abuse of discretion in giving the proffered mitigating evidence little or no weight.

As to Richmond's initial contention that state law required a listing of mitigating circumstances, there is no merit. Richmond does not cite what provision of the law or case holds such a requirement to exist. The Arizona Supreme Court's opinion in *State v. Vickers*, 129 Ariz. 506, 633 P.2d 315, 325 (1981), is to the contrary.[28] Even if such a requirement existed at the time of the sentencing, the state's failure to follow its own rules supports relief under habeas corpus only if it is of the magnitude so as to deny federal due process, *Cronnon v. Alabama*, 587 F.2d 246, 250 (5th Cir.1979). This court has not been cited to a single case that imposes a constitutional requirement that a list be made. There are holdings that no such a list is required, *Martin v. Maggio*, 711 F.2d 1273 (5th Cir.1983) including one in this court, *Jeffers v. Ricketts*, 627 F.Supp. 1334

(D.Ariz.1986). This court need not determine if such a list is required because in this case, a list of mitigating circumstances was made.

The sentencing judge in this case made specific findings as to both the proffered mitigating circumstances and the statutory mitigating circumstances listed in A.R.S. § 13–454(F), (volume 20, pages 116–120). In those findings he stated what factors he found and which ones he did not find to have been established by a preponderance of the evidence. Based on his findings, he then determined that the mitigating circumstances were not sufficiently substantial to call for leniency either as a group or considering them individually. The constitution requires nothing more in terms of a list.

Based on this court's review of the sentencing hearing record and transcripts, this court concludes that the sentencing judge did in fact consider the mitigating circumstances that were proffered to him. The record indicates, however, that Richmond's contention that the following mitigating circumstances were not considered, is correct: (1) Richmond's cooperation with the police; (5) the existence of a mental defect; and (7) the effect that the execution would have on his minor son. This conclusion, however, does not entitle Richmond to any relief.

In this court's review of the sentencing transcripts, the court finds absolutely no mention of any of these three mitigating circumstances. Under Arizona law, A.R.S. § 13–454(F) it is the Defendant's burden to establish mitigating circumstances by a preponderance of the evidence. The prosecutor is only under a duty to present the mitigating evidence that he has in his possession. There is no duty placed on the court to conduct its own investigation to seek out possible mitigating circumstances when Richmond is being

---

**28.** The Arizona Supreme Court has recently imposed such a requirement under state law, *State v. Leslie*, 147 Ariz. 38, 708 P.2d 719, 730–731 (1985).

**792**

represented by presumably[29] competent counsel. The constitution imposes no such requirement, *Jeffers v. Ricketts*, 627 F.Supp. 1334, 1359 (D.Ariz.1986).

Even examining the entire state court record in this matter, there is very little, if any, reference to these mitigating circumstances. Certainly not at such a level as to create a duty that the court consider these factors without the assistance of Richmond's counsel. The only evidence anywhere in the record that indicates any cooperation with the police is Richmond's statement made at the time of arrest (volume 7, pages 539–549). That statement is contradictory to the testimony of the other participants in the crime. Richmond also moved to suppress that statement contending that it was obtained from him in violation of his constitutional rights (Transcript of November 20 and 21, 1973, volume 2). The court further notes that Richmond did not turn himself in to the police. Rather, the police focused their attention on Richmond as a result of information obtained from Corella. Richmond was arrested and already in custody on other charges when the police were able to verify Corella's statement by locating Erwin (volume 7, pages 514–516). Until his arrest on this charge on September 11, 1973 Richmond provided no assistance to the police. Based on these facts, there is no evidence in the record of Richmond's cooperation with the police that would justify this court imposing a requirement that the sentencing judge raise this issue on his own.

Although in federal court inconsistent alternative theories of relief are available, this court finds it incredible that Richmond now contends that it was improper for the sentencing judge to disregard the evidence concerning his character defect of being a "sociopath." The consideration of this same evidence is the basis of Richmond's claim that Judge Roylston was biased and prejudiced against him, *see*, Issue III, *supra*. Richmond carefully excluded this evidence from being reconsidered at the time of the re-sentencing. He cannot now complain that the failure to consider it is invalid. If there was error, it was certainly invited error.

 This court's examination of the entire record in this matter can find absolutely no reference to the impact of the execution on Richmond's minor son. In fact, there is no reference anywhere in the record before this court, that Richmond even had a son. The constitution certainly does not require the sentencing court to hypothesize as to the impact of an execution on people that the judge does not even know exist. Richmond did present testimony concerning the impact of the execution of other family members, *e.g.* Richmond's mother (volume 20, pages 72–73). The record indicates that this was considered by the sentencing court in his consideration of Richmond's character change. Richmond is entitled to no relief on this claim.

As to the remainder of the listed mitigating circumstances that Richmond contends were not considered, the listing by the judge at the time of the sentencing establishes that they were, in fact, considered (volume 20, pages 117–120). The issue then is whether the determination to give these factors little or no weight is an unconstitutional abuse of discretion.

This court has already stated that it was not an abuse of discretion for the court to give little or no weight to the mitigating circumstances that there was no jury finding of Richmond's actual killing of the victim or that there was evidence that Richmond did not kill Crummett, Issue V, *supra*. Nothing more is required as to those claims.

 The sentencing court found as mitigation that although Faith Erwin and Becky Corella were involved in the commission of the crime, they were never charged[30] (volume 20, page 118). The court, however, concluded that this mitigat-

---

**29.** There has never been a claim before any court, that any of the attorneys who have represented Richmond over the years rendered ineffective assistance of counsel.

**30.** In fact, both were given immunity in exchange for their testimony.

ing circumstance was not sufficient to warrant leniency. This court agrees and finds no abuse of discretion.

Richmond's own statement concerning this crime has Faith Erwin playing, at most, a minor role in either the robbery or the murder. It was Richmond and Corella who decided to rob Crummett. Erwin was told that they were going to do it but to keep quiet about it. Richmond decided the location for the robbery and drove the participants to that location. Richmond struck the initial blow to Crummett and knocked him unconscious. Richmond then walked around to the other side of the car and picked up large rocks and threw them at Crummett's head. During this entire time, Erwin merely stood by, getting sick as she watched. Erwin did not try to stop the crime from occurring, nor did she report the matter to the police, she was also not an active participant. Richmond and Erwin both stated that Erwin received nothing from the robbery. Based on these facts, the court concludes that the failure to give little weight to the fact that Erwin was never charged with this crime was not arbitrary or an abuse of discretion.

The record indicates that the involvement of Corella in this crime was substantial and that she was an active participant. It appears that the robbery was her idea in the first place. It was her decision to proceed with the robbery after seeing the money in Crummett's wallet. After Richmond knocked Crummett to the ground and hit him with the rocks, Corella helped remove his wallet and watch and turned his pockets inside out. Corella shared in the proceeds from the robbery. In addition, she apparently told others that she was the one driving the car when it ran over Crummett. The fact that she was not charged with any crime due to her involvement in this situation should be given weight as a mitigating factor.

Although this evidence should be given weight as mitigation, the fact that it was held to not be sufficiently substantial so as to call for leniency is not an abuse of discretion. Both the sentencing court and

the Arizona Supreme Court rejected this evidence as not being sufficiently substantial to call for leniency. Both courts also found that it was Richmond who drove the car when it ran over Crummett. This is a determination of fact based in part on the testimony and credibility of witnesses and is supported by the record. The state courts then determined that Richmond was more culpable in this crime than Corella. Richmond was convicted of two separate first degree murders. He also had been convicted of kidnapping involving the use of a knife. The record shows that Richmond intended to inflict lethal force or at least to inflict substantial harm to Crummett when he threw the rocks at his head from directly above after Crummett was already unconscious.

In light of these facts, the conclusion that the fact that Corella was never charged in this case should be given weight, does not warrant a finding by this court that the decision that this mitigating circumstance was insufficient to call for leniency was an unconstitutional abuse of discretion. Accordingly, Richmond is not entitled to the relief he seeks based on this claim.

■ Richmond's claims concerning the proffered mitigation of his character change in prison does not support relief in this court. The evidence is characterized as "uncontroverted" because the prosecutor presented nothing to rebut it and Justice Feldman, in his dissent, characterized it the same way for the same reason, *State v. Richmond*, 136 Ariz. 312, 666 P.2d 57, 69–71 (1983) (Feldman J. dissenting). A careful review of the record however, establishes that other mitigating evidence presented by Richmond placed the alleged change in character in doubt. It would then be incorrect to consider this evidence to be "uncontroverted."

After the three day long sentencing hearing in this matter, Judge Roylston stated that as to the mitigating circumstance of a change in Richmond's character, he was unable to make a definitive ruling as to whether this was present or not (volume

20, page 119). This court's own review of the transcripts of that hearing require the conclusion that this determination did not constitute a constitutional violation or an abuse of discretion.

Richmond presented testimony concerning his character from numerous witnesses including friends, relatives, prison personnel and another death row inmate. That testimony is summarized here. Ruby Phelps, Richmond's sister testified that Richmond had changed in prison. He was able to communicate better, his vocabulary had improved and he had developed religious beliefs while in prison. She also stated that before Richmond was incarcerated, he had never been violent with any family members and in fact was always supportive and concerned about the family (volume 19, pages 20–27). Richmond's brother-in-law, William Phelps, testified as to the same changes in Richmond but also indicted that Richmond's concern for the family had been the same before and after incarceration (volume 19, pages 28–34). A friend named Holly Guran testified to the change in communication skills and to his religious beliefs (volume 19, pages 35–41).

Spencer Watson, another death row inmate,[31] testified that Richmond had a harsh attitude about being on death row when he first arrived there but that attitude was no longer present. He stated that Richmond spent most of his time reading books, that he had become religious, and that he was helpful to some of the other inmates on death row. Watson also stated that in his opinion, Richmond was not a violent person (volume 19, pages 96–110). Ricky Watson, a prison correctional program director testified that Richmond was one of the better inmates on death row. He testified that many prisoners, not just those on death row, developed religious beliefs while in jail but he considered Richmond to be serious about his beliefs. He was unable to state how Richmond would act if he was not on death row since the only times he had seen him out of his cell, Richmond had been accompanied by guards. His exposure to Richmond had been three visits a week for fourteen months (volume 19, pages 141–163).

Thomas Roberts, another counselor at the prison who had been a guard on death row for three years, testified that Richmond was one of the better behaved inmates on death row and that he read a large number of books. Roberts also stated that the length of time a person is on death row determines his attitude. The longer he is there, the better he fits in and is able to get along with other death row inmates (volume 19, pages 165–176).

Richmond's friend, Linda Taylor testified that Richmond had always been kind and concerned about the well-being of his friends. She also stated that the Richmond that she knew would not have committed two first degree murders and a kidnapping and that she was surprised that Richmond was involved in these crimes (volume 20, pages 22–29). Rose Allen, Taylor's mother and a friend of Richmond, testified that up to the time of his incarceration, Richmond had always helped her out around the house doing chores that she was unable to perform herself (volume 20, pages 47–51). Lenore Collins, an aunt of Richmond's testified that whenever she needed chores done around the house all she had to do was ask and Richmond would do them without expecting anything in return (volume 20, pages 51–54). Richmond's step-father, Arthur Patterson, testified that Richmond always conducted himself well whenever he had been around him or Richmond's mother. In fact, he stated that Richmond treated his mother better than anyone that Patterson knew (volume 20, pages 60–62).

Katie Brown, another sister of Richmond's, testified as to Richmond's improvement in communication, the fact that he had taught himself how to type in prison and the development of his religious beliefs. She stated that the family had always been close and still cared about him

---

**31.** Watson's sentence of death has subsequently been reversed and he is serving a life term,

*State v. Watson,* 129 Ariz. 60, 628 P.2d 943 (1981).

(volume 20, pages 63–68). Richmond's mother, Katie Patterson, also testified about the closeness of the family and Richmond's concern for their well-being. She indicated that she would be very hurt if he was executed (volume 20, pages 68–73). Finally, Richmond made a statement to the court in his own behalf. He stated that he had not had a complete spiritual change but that he was headed in that direction. He stated that he had a new purpose in life and wanted to live (volume 20, pages 74–76).

Examining this testimony as a whole, this court must conclude that Judge Roylston's conclusion that he could not determine if Richmond's character had changed is supported by the evidence. Although Richmond had made marked improvements in his communication skills, the way he expressed himself, and had developed religious beliefs, he did not establish that his character had changed. He had *always* been concerned about his family and friends and had been very helpful to them. Despite this, Richmond participated in the murder of two people, a robbery and a kidnapping. The prison officials that testified considered him to be well behaved but could not state what would happen if he were not guarded when he was out of his cell or released into the general prison population. There was also a history of drug abuse by Richmond prior to his incarceration that is not present on death row.

Richmond therefore failed to present sufficient evidence in support of his claim that his character had changed. The decision to give this little or no weight as a mitigating factor calling for leniency is not an abuse of discretion nor did it violate Richmond's constitutional rights. Richmond is entitled to no relief from this allegation.

## XI. VAGUE AGGRAVATING CIRCUMSTANCES.

 Richmond challenges the constitutionality of A.R.S. § 13–454(E)(6) under the fifth and eighth amendments. That statute is the aggravating circumstance that the defendant committed the murder in an es-

pecially cruel, heinous or depraved manner. Richmond contends that at the time of his initial sentencing there had been no limiting judicial interpretation of that circumstance so as to bring it within the limits of the constitution. He further contends that the facts of this case do not warrant the application of that aggravating circumstance here. Although both sides address this issue on the merits, this court will not do so. Richmond lacks standing in this proceeding to challenge the constitutionality of this provision.

At the time sentence was pronounced in this case, Judge Roylston found this aggravating circumstance to be present in that the defendant committed the murder in an especially cruel and heinous manner (volume 20, page 117). A careful reading of the Arizona Supreme Court's opinion on this matter indicates that they, in fact, reversed this holding despite affirming the imposition of the death sentence. The majority opinion written by Chief Justice Holohan and joined by Justice Hays upheld the sentencing court's finding as to the "heinous" factor and stated that the murder also satisfied the "depraved" factor, but held there was no evidence that the murder was committed in an "especially cruel manner" since there was no evidence of suffering, *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57, 64–65 (1983). Justices Cameron and Gordon specially concurred in the holding of the case but disagreed that the killing was "especially heinous and depraved." *Id.* at 67–69. Justice Feldman issued a dissenting opinion in this matter. It was his opinion that Richmond's change in character warranted leniency. He concurred with Justices Cameron and Gordon that the killing did not satisfy either the "heinous" or "depraved" standards, *Id.* at 69–71. All three of the opinions in this case agreed that the facts did not satisfy the "cruel" standard.

Of the five justices on the Supreme Court, none of them found the killing to have been especially cruel. Three of them held that the killing did not satisfy either the especially heinous or depraved stan-

dards. Since a majority of the Supreme Court found this circumstance to be absent, this court must conclude that Richmond's sentence of death is not based on the application of that aggravating circumstance. Here, Richmond challenges only his conviction and sentence. He therefore lacks standing to challenge the constitutionality of this statute.

## XII. LACK OF DUE PROCESS ON APPEAL.

Richmond contends that since his sentence of death was upheld on appeal on different grounds than it was imposed by the sentencing court, his sixth and eighth amendment rights were violated. The Arizona Supreme Court overturned the application of aggravating circumstance (E)(6) but affirmed the imposition of the sentence of death based on the other aggravating circumstances and the fact that the proffered mitigating circumstances were not sufficiently substantial so as to call for leniency. This is a legal rather than a factual challenge. No evidentiary hearing is requested and none is appropriate.

■■■ The constitution does not require a new sentencing merely because one aggravating circumstance is reversed where the state procedures do not involve a balancing of aggravating circumstances against mitigating circumstances, *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Even when the procedural scheme requires balancing, the mere reversal of one aggravating circumstance does not require a new sentencing when no mitigating circumstances are found, *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).

■■■ The Arizona procedural scheme does not balance numerically the aggravating circumstances against the mitigating circumstances. Rather it considers the quality of the aggravating circumstances and the quality of the mitigating circumstances in determining whether the sentence of life or death will be imposed, *State v. Brookover*, 124 Ariz. 38, 42, 601 P.2d 1322, 1326 (1979).

As this court has stated, the Arizona procedures adequately prevent the arbitrary, discriminatory, and freakish application of the death sentence. The consideration of mitigating circumstance and the requirement that at least one of a small number of specific statutory aggravating circumstances be present in each case mandates the individual determination of whether the death sentence will be imposed.

The aggravating circumstances found present in this case are according to the Arizona Supreme Court's opinion, very heavily weighted. One of the aggravating circumstances found in this case is that Richmond has been convicted and sentenced for another first degree murder, entirely separate from the killing in this case. This court has already held that there was no abuse of discretion in the weight given to the mitigating circumstances here.

The state court record indicates that the state supreme court conducted a careful and thorough review of the issues in this case. This court therefore concludes that even though the Arizona Supreme Court reversed one of the aggravating circumstances found in this case, it was not a denial of due process under the sixth or eighth amendments to not send the case back for another sentencing. In all other respects, the decisions of the sentencing court were affirmed. Richmond is entitled to no relief from this allegation.[32]

---

**32.** An additional reason for this conclusion should be noted. As stated previously, the sentencing court rejected at both sentencing hearings the proffered aggravating circumstance that the killing occurred as consideration for or in the expectation of the receipt of anything of pecuniary value, A.R.S. § 13–454(E)(5). This was based on the sentencing judge's belief that the particular aggravating circumstance applied only in the "murder for hire" or contract killing situation. The Arizona Supreme Court noted that this decision was in error but did not change the holding since the state did not appeal the decision at that time, *State v. Richmond*, 666 P.2d at 65. The state law is now clear that this aggravating circumstance applies

## XIII. LACK OF PROPORTIONALITY REVIEW.

Richmond claims that the proportionality review conducted in his case is constitutionally inadequate. In support of this claim, he asserts that the state court failed to consider cases where a life sentence was imposed, that Richmond was not aware that a proportionality review would occur and that the Supreme Court lacks adequate records to conduct such a review. Richmond seeks an evidentiary hearing to establish that the Arizona Supreme Court does not have adequate records to conduct a proportionality review and that the vast majority of the cases similar to this one have resulted in life sentences.

Richmond contended at oral argument that since his attorney did not know that a proportionality review would be conducted and the attorney did not know what would occur, then Richmond was denied the assistance of counsel in a proceeding where he was entitled to assistance. Richmond's claim that he did not know that the Supreme Court would conduct a proportionality review is without merit. The Arizona Supreme Court indicated that it would conduct such a review when it determined Richmond's first appeal, *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41, 51 (1976) ["In performing this review we find it necessary to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factors; . . . and, whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."]. Richmond has never before contended that any of his attorneys have rendered ineffective assistance. If by this allegation he seeks to make such a claim then he has failed to exhaust that issue before the state courts. Richmond's claim that he was denied the assistance of coun-

sel is without merit. Richmond does not challenge the review of the cases that were compared to his. Rather, the crux of his claim is that the proportionality review conducted was not sufficient because it did not consider cases where the sentence of life was imposed.

The constitution does not require a proportionality review, *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Once such a procedural right is granted, it cannot be administered in such a manner as to be arbitrary and discriminatory in violation of due process, *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

The Arizona Supreme Court compared the crime and the defendant in this case to those in *State v. Gretzler*, 659 P.2d 1 (1983); *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980); *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825 (1980); *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980); *State v. Evans*, 120 Ariz. 158, 584 P.2d 1149 (1978), *sentence aff'd*, 124 Ariz. 526, 606 P.2d 16; and *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981). This court has considered those cases and has compared them to the facts of this case. The comparison of these cases is not so arbitrary and discriminatory as to constitute a violation of due process.

Richmond's request for an evidentiary hearing to establish the claims under this allegation is denied. He fails to assert a single "fact" that the Supreme Court should have considered in conducting its review but does not have. A hearing on this claim would be nothing more than a fishing expedition into what information the Arizona Supreme Court has at its disposal. This is not the purpose of an evidentiary hearing in a habeas corpus case.

The claim that the proportionality review is not sufficient because it does not compare the facts of the case to those

to a killing during the course of a robbery. Since the trial court rejected this evidence as a matter of law, the rejection does not constitute an acquittal under the double jeopardy clause, *Poland v. Arizona*, —— U.S. ——, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). For the same reasons

discussed in Issue II, *supra*, Richmond would probably validly have that aggravating circumstance presented against him at any new sentencing had the Supreme Court vacated his sentence.

where a life sentence was initially imposed does not state a constitutional issue, *Proffitt v. Florida*, 428 U.S. 227, 96 S.Ct. 2971, 2970 n. 16, 49 L.Ed.2d 904 (1976); *Gray v. Lucas*, 677 F.2d 1086, 1111 (5th Cir.1982). In addition, this court accepts as true Richmond's argument that the vast majority of crimes similar to his result in a life sentence. What Richmond overlooks, however, is that Richmond is on death row after a consideration of this crime *and* his character and past record, including prior offenses for first degree murder and kidnapping. The Arizona death sentence is reserved for the above the normal murders and *murderers, State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979). Richmond is not entitled to relief based on this allegation.

## XIV. ARBITRARY DEATH SENTENCE.

Richmond alleges that the sentence of death in Arizona, the United States and in this case is arbitrarily imposed because similar cases in all respects including age, prior record, culpability, and character have resulted in lesser punishment than death; that there is no rational constitutionally permissible basis to distinguish this case from those; and that prosecutors, judges and juries have considered factors other than the strengths and weaknesses of the case in determining whether to seek and impose the death sentence. Richmond seeks an evidentiary hearing to establish these claims.

This claim is nothing more than a restatement of Richmond's proportionality review argument set forth in Issue XIII, *supra*. In addition, it is the exact same argument presented to this court in *Jeffers v. Ricketts*, 627 F.Supp. 1334, 1363 (D.Ariz. 1986). This argument is wholly conclusory. Not one fact is presented in support of this claim or in support of the request for an evidentiary hearing. Richmond has not referred this court to any other cases that would support this claim. The request for an evidentiary hearing on this claim is denied and the court concludes, based on what has been presented to it that the

argument here is nothing more than a conclusory unsupported challenge. The claim is therefore without merit.

## XV. DISCRIMINATORY DEATH SENTENCING.

Richmond alleges that the death sentence is being discriminatorily imposed in Arizona, the United States and in this case against impoverished males whose victims were caucasians. He contends that the probability of receiving the death sentence is overwhelmingly greater if the victim is caucasian and the defendant a poor male. Richmond asserts that every person on death row is a poor male and has at least one caucasian victim. One of the reasons asserted to explain this claim is that most of the prosecutors and judges in Arizona are caucasian. Richmond further contends that no woman has been sentenced to death under this death penalty statute although ten percent of the potential capital crimes are committed by women. Also in support of this claim and in support of the motion for an evidentiary hearing, Richmond submits a study of the Arizona capital sentencing scheme with supporting affidavits and statistics. After thoroughly reviewing this information, the court concludes that there is absolutely no credible factual support for this allegation.

The materials submitted to the court include a statement of the study and conclusions of Dr. William Bowers dated December 20, 1979; statements and testimony of Dr. Mikel Aickin; the statement of Dr. Joseph Stephens and the pleadings from another pending habeas corpus case before another Judge in this District. Each of the statements of the studies conducted above conclude that the death sentence is being discriminatorily applied in Arizona based either on race, gender or poverty status.

The study by Dr. Bowers concludes that the race of the victim and the Defendant are both factors in the sentencing determination. This is based on his findings that the killers of whites are seven times more likely to receive the death sentence than the killers of blacks and that murderers

who are black are four times more likely to receive the death sentence than are white murderers.

These findings are based on a comparison of the Federal Bureau of Investigation uniform crime statistics for the years 1976 and 1977 with information obtained from the Arizona agency collecting Vital Records for all years between August 1973 to December 1977. These statistics were then compared to the population of death row.

According to the F.B.I. publication, *Crime In The United States*, the statistics concerning criminal homicides pertain to the classifications of these crimes from police reports. Included under this category are all homicides and non-negligent manslaughter. Under Arizona then, this statistic would include the crimes of first degree murder, second degree murder and voluntary manslaughter.

The Court attempted to locate the source of the Arizona records pertaining to the vital statistics. No publication of those records are available. The information provided to Richmond and this court are based on the reported cause of death taken from death certificates. The information provided under the category of willful homicides includes all deaths caused by injuries inflicted with the intent to kill, exclusive of war and legal intervention. This apparently would then also include first and second degree murder as well as voluntary manslaughter.

Under Arizona law, only those persons convicted of first degree murder are even considered for the sentence of death, A.R.S. § 13–454(A). The study by Dr. Bowers then makes a determination of racial factors based in part upon cases where the death sentence could not be imposed as a matter of law. The study does not distinguish what portion of the crimes listed do not constitute first degree murder. The information from the sources cited does not provide that breakdown either.

The study also makes the comparison of homicides from a two year period of time, determines the percentage of those homicides to all those occurring from the date the death penalty statute is enacted and then applies that percentage to the persons present on death row since August, 1973. It is not clear to the court why the study did not compare the homicides from August, 1973 to December, 1977 with the population on death row. That would be a much more accurate study. It would also have been more accurate to compare the two year crime rate with the number of death sentences imposed during that two year period. Instead, the study over-emphasizes a two year period of crimes as compared to a death row population created over five years. The court also notes that the study concerns classifications of crimes from police reports and doctor/coroner's death certificates. It does not limit the study to only the results following full trials or convictions for the crimes of first degree murder. The entire sample of the study is therefore inflated.

The study by Dr. Mikel Aickin compares the death certificate causes of death with a table of Defendants and "co-Defendants" in cases where the death penalty was imposed. The table of "co-Defendants" was submitted by an attorney representing some of the inmates on death row and was based on his knowledge of the facts of the cases. In the study of these cases, it is admitted that the culpability of the "co-Defendants" is not taken into consideration. Richmond contended at oral argument on this issue that this study reliably controls for the aggravation factor. It does not. It fails to consider the role of each co-defendant in the murder. The study also fails to consider the additional aggravation factors that are related to the Defendant himself (i.e. prior offenses, etc.) rather than those solely related to the manner and method of the killing.

Based on this comparison, Dr. Aickin concludes that the race of the victim, gender of the Defendant and the financial ability to afford retained counsel are all factors in the determination of whether or not to impose a sentence of death. The examina-

tion of the data in this study places those conclusions in doubt.

The persons identified as "co-Defendants" are persons identified as such by the actual Defendants themselves. For example, Exhibit 5 to this study lists nine murders and the "co-Defendants" involved in those murders. Listed for the murder in this case are Richmond, Faith Erwin and Becky Corella. Listed under another murder are Jimmie Wayne Jeffers and Doris Van der Veer.[33] The study indicates that of these two cases, if gender was not a factor in the determination, the probabilities are that 1.16 of the three women named would have received the death sentence.

A careful examination of the facts of this case, considering the culpability of the "co-Defendants," requires the conclusion that neither Erwin or Corella would receive the death sentence here. The court discussed the role of each of these persons under Issue X, *supra*. The record is clear that Erwin's role in this case was as a silent spectator. Under no one's version of the incident did she do more than keep quiet and watch. A jury could conceivably have found her guilty of the crime of first degree murder but the constitution would absolutely bar the imposition of the death sentence, *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

This court considers Corella to have been a principal in this crime. Although she was an active participant and probably the instigator of the robbery, there is no clear evidence that she killed or intended to kill Crummett. This also presents an *Enmund* issue. Even if it was determined that she actually drove the car over Crummett, it is still very unlikely that she would have received the death sentence. The aggravating circumstance found to be present by the sentencing court as to the crime is that the murder was committed in an especially cruel and heinous manner. As stated be-fore, the Supreme Court reversed that finding in this case.

The only other aggravating circumstance evident from the crime itself is A.R.S. § 13–454(E)(5) that the killing occurred in anticipation of something of pecuniary value. The sentencing judge rejected this circumstance as a matter of law because this was not a "contract killing" or "murder for hire" situation. As the Supreme Court pointed out in its decision in this case, that factor also applies to murders during the course of a robbery, *State v. Richmond*, 666 P.2d at 65. Richmond benefitted from this erroneous interpretation of state law and had Corella been tried for this crime with Richmond or at about the same time, she too would have received that benefit. None of the aggravating circumstances pertaining to the crime would have been present as to Corella. She would therefore probably not have received the death sentence. The court recognizes that it does not have any information whether or not any aggravating circumstances related to Corella's past record are present in this case.

In the *Jeffers* case, it is incorrect to characterize Van der Veer as a "co-Defendant." Van der Veer testified at the trial in that case that she was forced at gun point to watch as Jeffers injected heroin into the already unconscious victim. When that did not kill her, Jeffers then strangled her until she did die. Jeffers testified that he was not even at the location at the time the victim died. This was an issue of credibility. The jury convicted Jeffers of both the first degree murder and of an assault on Van der Veer. The jury apparently believed Van der Veer. In that case then, Van der Veer was a victim, not a "co-Defendant."

In the study, nine crimes are listed with the "co-Defendants" for those crimes. The study expected that based on the "co-Defendant" involvement, there would be 4.60

---

**33.** On February 4, 1986 this court issued a decision in a habeas corpus case pertaining to the death sentence and conviction in that case, *Jeffers v. Ricketts*, 627 F.Supp. 1334 (D.Ariz.1986).

The court carefully reviewed the state court record in that case to reach its decision and is very familiar with the facts of that crime.

sentences of death against women "co-Defendants." As stated above, 1.16 of those sentences, or twenty-five percent, would be based on the "co-Defendants" in this case and in *Jeffers*. Yet an examination of the *facts* of those cases reveals that none of the "co-Defendants" would be sentenced to death.

This study chose to disregard the culpability of the "co-Defendants" in its analysis. It also disregards Arizona law. As stated above, Arizona law bases the death penalty decision on both the crime and the criminal. This study focuses only on the crime and ignores the factor of the criminal.

The comparison of the study as to retained and appointed counsel suffers from the same defect. The study uses the same "co-Defendant" determination to reach a figure of how many death sentences would be obtained where "co-Defendants" have retained counsel. The study anticipates 3.74 such sentences but finds only one imposed. Again, the study disregards the culpability of the "co-Defendants" and fails to consider aggravating circumstances, all necessary elements in a death sentencing determination. The analysis of the race factor in this study suffers from the same defect.

The study here includes persons that would not be eligible for the sentence of death. Then, when the death sentence is in fact not imposed, the conclusion is made that it was based on race, gender or poverty status. The facts underlying the study do not support this conclusion.

The study conducted by Dr. Joseph Stevens recognizes the problems present in the Bowers and Aickin studies and cautions that those same elements are present in his. Dr. Stevens concludes that based on the information submitted to him, he cannot state that the race of the Defendant is a factor in the death sentencing determination. He does indicate that it appears that the killer of a caucasian is more likely to receive the death sentence than the killer of a black person. As to the level of his certainty as to this conclusion, Dr. Stevens states that the statistics "at best, only suggest" this appearance.

The study by Dr. Stevens does not state whether the category of "caucasian" includes a person of hispanic descent or not. The other studies either state that they include hispanics within that category or have a separate category for hispanics. The Stevens study does have a category for "other" but the makeup of that category is not stated. The reason for this concern is that the only evidence before this court is that Bernard Crummett was Mexican or hispanic (Transcription of statement made to the police by Rebecca Corella, attached to the Opposition to First Petition for Post-Conviction Relief, Volume 12).

With these concerns in mind, it is necessary to turn to the constitutional issues presented in this case. The standard for a challenge based on generalized statistical studies was stated by the Eleventh Circuit. "Disparate impact alone is insufficient to establish a violation of the fourteenth amendment. There must be a showing of an intent to discriminate.... Only if the evidence of disparate impact is so strong that the only permissible inference is one of intentional discrimination will it alone suffice." *Adams v. Wainwright*, 709 F.2d 1443, 1449 (11th Cir.1983); *McCleskey v. Kemp*, 753 F.2d 877, 893 (11th Cir.1985) *en banc.*[34]

Richmond has not asserted any facts to indicate that his sentence of death was imposed based upon any of these improper considerations. He alleges only that his

---

**34.** At oral argument Richmond argued that this standard was invalid. He equates the finding of disparity with a conclusion of discrimination. A statistical disparity standing alone does not establish discrimination. The simple randomness of any statistical study can account for some disparities. Therefore, unless the disparity is so great as to indicate that something other than randomness is responsible, discrimination will not be presumed. This court concludes that unless there is some direct evidence of discrimination then the Eleventh Circuit's standard is an appropriate standard to apply.

sentence is imposed as part of the pattern and practice of discrimination.

Even if this court accepted the studies offered here as being accurate, they do not show a disparity so great as to warrant a presumption of intentional discrimination. Despite the disparity shown by the statistics, the studies indicate that at the time they were prepared, there were only a total of six black inmates on death row. Four of those were there for killing at least one caucasian (assuming that Crummett was a "caucasian") victim. There are a large percentage of persons on death row for killing caucasian victims. The studies indicate that approximately thirty of those death row inmates are also caucasian. One of Dr. Stevens studies indicates that at the time of the study, there was a total of thirty-six inmates on death row. All of the studies show that the probability of receiving the death sentence is extremely low. The disparity presented here is not so significant that it warrants the conclusion that intentional discrimination is present in the Arizona system. Some of these same studies have also been rejected by another judge in this District in an unpublished opinion, *Knapp v. Wawrzaszek*, CIV 83–2270 PHX RCB, order filed July 8, 1985.

This court, however, does not accept these studies as being accurate. The mere reading of the studies and an examination of the data contained therein requires the conclusion that they are deficient. None of the studies takes into consideration the presence of aggravating circumstances associated with the crime and the killer. The Bowers study is based on a group for which some portion is not eligible for the death sentence because they did not commit the crime of first degree murder. The Aickin study fails to consider the culpability of its group of "co-Defendants" and includes persons that were not involved in the crime or played only a very small role. The studies here are far less trustworthy than the study rejected by the Eleventh Circuit in *McCleskey, supra.* In that study certain factors were taken into consideration in order to have a more accurate result, such as aggravating and mitigating

circumstances, race, gender, rural and urban locations for the crimes, etc. These studies before this court do not support the claims for which they are submitted.

This court does not know why there are no women on death row in Arizona. The evidence that Richmond has presented to prove that this is a result of discrimination does not support his allegations. The studies indicate that women are not on death row because the crimes that they were involved in did not permit their execution or they were not eligible for the death sentence. Other than the mere fact that there are no women on death row, there is nothing to support the claim that women are not there because of discrimination.

Richmond presents no other factual evidence in support of these claims of discrimination. He seeks an evidentiary hearing to further develop this claim and requests discovery to obtain information to further develop these and other studies concerning the death sentence. The studies presented to this court are inadequate to establish that the Arizona death sentencing scheme is based on considerations of race, gender or poverty status. Further development of these studies would serve no purpose. Whether or not additional information obtained through discovery would present sufficient evidence of improper discrimination is nothing more than speculation. Richmond has failed to establish a violation of his constitutional rights or to even present sufficient factual support which raises a constitutional question as to the validity of his sentence so as to warrant an evidentiary hearing.

## XVI. CRUELTY OF CAPITAL PUNISHMENT IN FACT.

■ Richmond alleges that the manner of imposition of the death sentence is unconstitutional cruel and unusual punishment. He does not challenge the method of the actual execution in Arizona (lethal gas) but rather directs his challenges to the conditions and length of confinement on death row.

He contends that the close punitive confinement he has endured since August, 1973, uncertain as to whether or not he would be executed or when, has produced a state of fear and anxiety in him that serves no penal purpose. He further contends that the long delays, particularly prior to the re-sentencing, were in no way attributed to him. Richmond seeks an evidentiary hearing to establish these claims.

The court accepts the claim that confinement under a sentence of death would create uncertainty as to the execution and produce some fear and anxiety. Richmond's sentence of death was not imposed until February 27, 1974. Following his conviction, he was tried and convicted of another offense of first degree murder in Pima County Superior Court. That conviction did not occur until August, 1974. The state court record indicates that Richmond was confined for a period of time at the Pima County Jail prior to and during his re-sentencing hearings. It is incorrect to state that Richmond has been continuously on death row since August, 1973.

Richmond's claims that he is not responsible for the delays is also without merit. Following his conviction, Richmond filed a petition for post-conviction relief. His conviction was also subject to automatic review by the Arizona Supreme Court. After the affirmance of the sentence, Richmond sought relief in the United States Supreme Court. Following that he filed a petition for a writ of habeas corpus in federal court. Pursuant to that petition, in 1978 the writ was granted and a new sentencing was ordered.

Richmond's counsel at the time of re-sentencing requested and was able to have the re-sentencing hearings postponed for almost one year in order to provide him with additional time to prepare the case as well as to file a special action with the Arizona Supreme Court. Following the second sentencing, another automatic appeal was taken. In addition, the record indicates that Richmond filed a separate notice of appeal other than the automatic appeal. He then filed a second petition for post-conviction relief. Following the affirmance of the second sentence of death, Richmond again sought certiorari from the United States Supreme Court. Richmond then filed a third petition for post-conviction relief in state court. He then filed this action.

As the Supreme Court stated in *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), an eight year delay between the arrest and sentencing was not a constitutional violation because the delay resulted from the need to assure a careful review of an unusually complex case. In a case such as this one, where the death penalty is being imposed, the need for a careful review of the issues is clear.

The time on death row has not been completely harmful to Richmond. He has been able to develop better skills in communicating with others. He is no longer exposed to the combination of drugs that he was taking at the time of the murder. Richmond has also developed religious beliefs that he did not have before he went to prison.

Richmond has been under a death sentence for approximately twelve years. He has been subject to the current sentence of death for only six years. Although the conditions on death row may not be ideal, there is no evidence of cruel and unusual punishment presented sufficient to warrant the relief Richmond seeks here.

The delay in the execution was prompted by Richmond's request, through his attorneys, to have his challenges to the state court proceedings and the constitutional challenges to the sentence of death heard by several courts. The fact that this review has taken a long time does not indicate that the delay is unwarranted, *see, People v. Chessman*, 52 Cal.2d 467, 341 P.2d 679, 699–700 (1959). The careful review of the issues raised by Richmond is time consuming. However, it is the opinion of this court that it is better to take the time to consider each issue thoroughly rather than quickly dispatching someone to the gas chamber. Richmond has presented nothing to this court which would support the relief he seeks under this allegation.

## XVII. THE EXCESSIVE CRUELTY OF DEATH.

Richmond alleges that the sentence of death serves no purpose of deterrence or retribution and is a purposeless infliction of pain and suffering without any valid state interest. He contends that the infrequent use of execution (none in Arizona since 1964) makes it fail as a deterrent. He contends that it merely sets socially sanctioned examples of violence and provides an inducement for violence. Richmond seeks an evidentiary hearing on this claim.

■■■ Capital punishment is not an unconstitutional form of punishment, *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Arizona legislature determined that the punishment of death would be imposed on criminals committing the crime of first degree murder in a manner which sets the murder apart from the "norm" of murders or by a murderer who is himself above the "norm" of murderers. There is nothing unconstitutional in this purpose or in the availability of such a penalty under Arizona law.

## CONCLUSION

This court has thoroughly reviewed all of the claims presented in this petition. After considering the state court record and the factual support offered, this court concludes that Richmond is not entitled to a granting of the writ of habeas corpus under the allegations of this petition. Accordingly, the petition will be denied and the action dismissed.

The court finds that none of the allegations presented in this petition presents a colorable constitutional claim. This court will therefore refuse to issue a certificate of probable cause for appeal.

On March 11, 1986 Richmond moved this court for an order directing the clerk of this court to provide a copy of the entire state court record on file herein. By order of this court on March 12, 1986 this court indicated that it would grant that order. Before it would do so however, the court required the attorney for Richmond to examine the record on file so that the clerk would not have to pay the expense of copying matters that are not related to this petition. Richmond's counsel has not done this. This court concludes that the state court record is no longer needed by Richmond's current counsel and accordingly, this motion will be denied as withdrawn.

IT IS ORDERED that the petition for a writ of habeas corpus in this action is denied and this action is dismissed.

IT IS FURTHER ORDERED that the motion for an evidentiary hearing is denied.

IT IS FURTHER ORDERED that the motion for discovery is denied.

IT IS FURTHER ORDERED that for the reasons stated herein, this court will not issue a certificate of probable cause for appeal.

IT IS FURTHER ORDERED that the motion for copies of the state court record on file herein is denied as withdrawn.

## APPENDIX

The Respondent has filed twenty-five exhibits which consist of the state court record in this matter. The court has placed those records in chronological order and has labeled each one with a volume number. The contents of each volume is listed below.

| Volume | Date | Contents |
|---|---|---|
| 1 | September 7, 1973 | transcript of preliminary hearing |
| 2 | November 20, 1973 | transcript of motion to suppress statements |
| | November 21, 1973 | transcript of continued hearing on motion to suppress statements. |
| | December 10, 1973 | transcript of motion to continue trial |
| 3 | Undated | transcript of voir dire of jury and closing arguments |
| 4 | January 14, 1974 | transcript of pretrial motions |
| | January 15, 1974 | transcript of first day of trial |
| | January 16, 1974 | transcript of trial, second day |
| 5 | January 16, 1974 cont. | transcript of trial, second day continued |

| Volume | Date | Contents |
|---|---|---|
| | January 17, 1974 | transcript of trial, third day |
| 6 | January 17, 1974 cont. | transcript of trial, third day continued |
| | January 18, 1974 | transcript of trial, fourth day |
| 7 | January 18, 1974 cont. | transcript of trial, fourth day continued |
| | January 21, 1974 | transcript of trial, fifth day |
| | January 22, 1974 | transcript of trial, sixth day |
| 8 | 1973 to 1974 | pre-trial pleadings |
| 9 | January, 1974 | trial pleadings |
| 10 | 1974 | post-trial pleadings |
| 11 | February 25, 1974 | transcript of sentencing hearing, first day |
| | February 26, 1974 | transcript of sentencing hearing, second day |
| | February 27, 1974 | transcript of sentencing hearing, third day |
| 12 | | first petition for relief under Rule 32 and opinions of Arizona Supreme Court |
| 13 | | Richmond's opening brief on appeal before the Arizona Supreme Court |
| 14 | September, 1977 | Richmond's petition for Writ of Habeas Corpus in federal court |
| 15 | June 18, 1979 | transcript of motion for psychiatric evaluation |
| | June 25, 1979 | transcript of motion to continue sentencing |
| | July 2, 1979 | transcript of motion for disclosure of Richmond's prison file |
| | August 6, 1979 | transcript of motion to disqualify judge and motion to continue sentencing |
| | September 4, 1979 | transcript of motion to disqualify judge |
| | September 10, 1979 | transcript of motion to continue sentencing |
| | August 13, 1979 | transcript of motion to continue sentencing, motion for pre-trial conference |

| Volume | Date | Contents |
|---|---|---|
| 16 | September 12, 1979 | transcript of motion to continue sentencing |
| | October 9, 1979 | transcript of motion to continue sentencing |
| | November 5, 1979 | transcript of motion to continue sentencing |
| | November 26, 1979 | transcript of motion to continue sentencing |
| | December 4, 1979 | transcript of motion to continue sentencing |
| | December 14, 1979 | transcript of motion to compel disclosure |
| | January 7, 1980 | transcript of motion to continue sentencing |
| 17 | January 14, 1980 | transcript of motion in limine |
| | August 6, 1979 | duplicate transcript of motion to disqualify judge (see volume 15) |
| | September 4, 1979 | duplicate transcript of motion to disqualify judge (see volume 15) |
| | September 10, 1979 | duplicate transcript of motion to continue sentencing (see volume 15) |
| | February 12, 1980 | transcript of motion to continue sentencing |
| | February 26, 1980 | transcript of motion to reconsider order regarding the place of incarceration |
| | March 10, 1980 | transcript of motion to continue sentencing |
| 18 | March 11, 1980 | transcript of resentencing hearing, first day |
| 19 | March 12, 1980 | transcript of resentencing hearing, second day |
| 20 | March 13, 1980 | transcript of resentencing hearing, third day |
| 21 | 1979 | various state court pleadings and minute entries |
| 22 | 1979 to 1980 | various state court pleadings and minute entries |
| 23 | | second and third petitions for post-conviction relief pursuant to Rule |

| Volume | Date | Contents |
|---|---|---|
| | | 32 and other post-conviction pleadings |
| 24 | | Richmond's opening brief before Arizona Supreme Court regarding resentencing, motion for rehearing before Arizona Supreme Court |
| 25 | | application for stay of execution before Arizona Supreme Court, third petition for post-conviction relief pursuant to Rule 32, opposition to stay of execution, response to third petition for post-conviction relief, motion for rehearing before Arizona Supreme Court and opposition to that motion, order denying stay of execution. |

Additional state court records were submitted by Richmond on August 29, 1984 and have been considered by the court. Those records include the requested jury instructions, transcript of hearing on objections to the courts jury instructions and further trial testimony.